**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 02-10198
_____

TOMMY THOMPSON, SECRETARY,
DEPARTMENT OF HEALTH & HUMAN SERVICES,

Plaintiff-Appellant,

v.

STEPHEN GOETZMANN; ET AL.,

Defendants,

STEPHEN GOETZMANN; BERNICE LOFTIN;
ZIMMER, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northen District of Texas, Dallas

_____

December 17, 2002

Before JOLLY, DUHÉ, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant Tommy Thompson, Secretary of the United States Department of Health & Human Services ("government") appeals from the district court's dismissal of complaints against (1) Defendant-Appellee Zimmer, Inc. ("Zimmer"), pursuant to FED. R. CIV. P. 12(b)(6), and (2) Defendant-Appellee Bernice Loftin and her attorney, Defendant-Appellee Stephen Goetzmann, by summary judgment in their favor. The government had filed suit against all three Defendants-Appellees, seeking reimbursement for Medicare expenditures related to Loftin's medical treatment. This was the

same treatment that was the genesis of Loftin's retaining Goetzmann to sue Zimmer, the manufacturer of her artificial hip prosthesis, which suit was settled prior to trial. Concluding that the government's complaint is without any basis in law and that there is no legal right of recovery against these three parties, we affirm the district court's dismissal of the government's action.

## I. FACTS & PROCEEDINGS

In June 1993, Loftin underwent surgery to replace her hip joint with a prosthesis manufactured by Zimmer. That procedure was paid for by the government through the Medicare program. Complications arose, requiring Loftin to undergo a second surgery. Thereafter, Loftin continued to experience medical problems related to her hip prosthesis. Medicare paid approximately $143,881.82 for Loftin's two surgeries and subsequent medical treatment.

Representing Loftin, Goetzmann filed suit against Zimmer for products liability, alleging defective design of the hip prosthesis. Lofitn's claims included the medical expenses paid for by Medicare. Loftin and Zimmer settled in lieu of going to trial. Without admitting liability, Zimmer paid Loftin the unitemized lump sum of $256,000. Zimmer disbursed the full amount of the settlement to Goetzmann, who, after deducting his 40% contingency fee, distributed the balance to Loftin. The entire settlement was paid by Zimmer; no part was paid from insurance.

In October 2000, the government filed suit against Goetzmann, Loftin, and Zimmer under the Medicare Secondary Provider ("MSP")

2

statute,[1] which authorizes the government to seek reimbursement from entities providing primary insurance coverage for medical services previously paid by Medicare. Among other things, the MSP statute authorizes the government to obtain reimbursement from a firm or entity that has a "self-insurance plan."[2]

The government alleged that Zimmer was "self-insured for its liability to Loftin," which, as a putative tortfeasor settling Loftin's products-liability action against it, had paid Loftin a substantial sum of money. This payment, insisted the government, was ostensibly for Loftin's medical expenses, which were originally paid for by the Medicare program. Claiming entitlement to relief under the MSP statute and its implementing regulations, the government sought reimbursement from Goetzmann and Loftin, and double damages from Zimmer.

Zimmer moved to dismiss the government's complaint against it under Rule 12(b)(6) for failure to state a claim on which relief could be granted. Zimmer asserted that its tort settlement with Loftin was not tantamount to maintaining a "self-insurance plan," as defined in the MSP statute. Zimmer argued, in the alternative, that its inability to pay for Loftin's medical services "promptly," as required by the MSP statute, precluded it from meeting the definition of a "self-insured plan." The district court declined

---

[1] 42 U.S.C. § 1395y(b) (2002).

[2] § 1395y(b)(2)(A)(ii).

to determine, on a motion to dismiss, whether Zimmer's settlement agreement with Loftin met the statutory definition of a "self-insured plan." The district court nonetheless ordered the government's complaint dismissed, holding that, as a matter of law, Zimmer could not have paid for Loftin's medical services "promptly," as required by the MSP statute.

Goetzmann and Loftin subsequently moved for summary judgment, arguing that they were not required to reimburse Medicare because they did not receive payment from an insurer or self-insured entity. Agreeing with Goetzmann and Loftin that the MSP statute predicates their reimbursement liability on their receipt of payment from, inter alia, a self-insurance plan that would pay "promptly" for medical services, the district court granted summary judgment to both Goetzmann and Loftin. The government timely filed a notice of appeal from the court's dismissals of Zimmer, Goetzmann, and Loftin.

II. ANALYSIS

A.   Background.

Although the government has litigated similar cases in several district courts around the country, we are the first appellate court to address the issue of an alleged tortfeasor's reimbursement liability under the MSP statute. Notably, the government's prior efforts have proved uniformly feckless — every court that has

4

heard its arguments on this issue, including the district court in the instant case, has rejected the government's expansive interpretation of the MSP statute.

In this case, the government retreads the same unsuccessful arguments that it has advanced in these prior cases. As we conclude that the statutory analyses performed by the district courts in the prior cases are sound, that the law has not changed, and that the government has not adduced any new facts that require us to reconsider the meaning or scope of the MSP statute, we affirm the district court's decision in this case. We shall first discuss the government's claims against Zimmer, because the liability of Goetzmann and Loftin is predicated on determining whether Zimmer qualifies as having a "self-insured plan" under the MSP statute.

B.    Zimmer's Reimbursement Liability Under the MSP Statute.

1.    Standard of Review.

A district court's order dismissing a complaint under Rule 12(b)(6) is reviewed <u>de novo</u>.[3]   On appeal, we must liberally construe the complaint and assume that all facts pleaded therein are true,[4] keeping in mind that such dismissals of complaints are "viewed with disfavor."[5]   We must also remain mindful of the

---

[3] <u>Lowrey v. Tex. A&M Univ. Sys.</u>, 117 F.3d 242, 246 (5th Cir. 1997).

[4] <u>Id.</u> at 247 (citing <u>Campbell v. Wells Fargo Bank</u>, 781 F.2d 440, 442 (5th Cir. 1986)).

[5] <u>Kaiser Aluminum & Chem. Sales v. Avondale Shipyards</u>, 677 F.2d 1045, 1050 (5th Cir. 1982).

Supreme Court's injunction that a Rule 12(b)(6) motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."[6]

   2.   Zimmer's Settlement Agreement with Loftin is Not a "Self-Insurance Plan" Under the MSP Statute.

The government contends that Zimmer is liable for reimbursing the government's Medicare expenditures by virtue of Zimmer's having a "self-insurance plan" because Zimmer was "required or responsible" to make healthcare-related payments to Loftin, a Medicare recipient. The government's argument for holding Zimmer liable under the MSP statute is relatively straightforward: (1) The legislative history reflects that the purpose of the MSP is to reduce Medicare expenditures, (2) the statute achieves this purpose by requiring reimbursement of payments from any "self-insurance plan,"[7] (3) an entity is "self-insured" if it is "required or responsible" for making payments to a Medicare recipient,[8] and (4) the MSP statute provides a right of recovery to the government in seeking reimbursement from such "self-insurance plans" that have paid monies to Medicare recipients.[9] In this case, the "self-insurance plan" is alleged by the government to exist by virtue of

---

[6] Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

[7] § 1395y(b)(2)(A)(ii).

[8] § 1395y(b)(2)(B)(ii).

[9] Id.

6

Zimmer's payment to Medicare recipient Loftin under the terms of their products-liability settlement agreement. Thus, the government concludes, Zimmer (as well as Goetzmann and Loftin) must reimburse the government for its Medicare expenditures because this is in accord with the legislative intent underlying the MSP statute.

In assessing whether the MSP statute applies to Zimmer's settlement agreement with Loftin, we must start with the actual words of the MSP statute,[10] for it is the words of the statute that set the metes and bounds of the authority granted by Congress.[11] Thus, we need not ⸺ and, indeed, should not ⸺ look to legislative history when the statute is clear on its face. When "the language of the federal statute is plain and unambiguous, it begins and ends our enquiry."[12]

The terms and structure of the MSP statute aptly reflect its general purpose. In enacting this law, Congress laudably sought to reduce Medicare costs by making the government a secondary provider of medical insurance coverage when a Medicare recipient has other

---

[10] Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) (recognizing that the "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning").

[11] Blue Cross & Blue Shield of Tex. v. Shalala, 995 F.2d 70, 73 (5th Cir. 1993) (noting that the words of a statute reflect the intention of Congress, and "Congress's intention is the law and must be followed").

[12] United States v. Osborne, 262 F.3d 486, 490 (5th Cir. 2001).

sources of primary insurance coverage.[13]  The MSP statute states, in pertinent part, that:

> Payment under [the Medicare program] may not be made . . . with respect to any item or service to the extent that

> (i)    payment has been made, or can reasonably be expected to be made, . . . as required [under a group health plan], or

> (ii)   payment has been made or can reasonably be expected to be made promptly (as determined in accordance with regulations) under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insurance plan) or under no fault insurance.

> In this subsection, the term "primary plan" means a group health plan or large group health plan, to the extent that clause (i) applies, and a workman's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies.[14]

The MSP statute also authorizes the government to make conditional healthcare payments when a Medicare recipient already has coverage provided by a primary insurance plan; and the government has a right of action in reimbursement to recover these conditional healthcare payments from such primary plans:

> (i) Primary Plans

> Any payment under this subchapter . . . shall be conditioned on reimbursement to the appropriate Trust Fund established by this subchapter when notice or other information is received

---

[13] Blue Cross & Blue Shield of Tex., 995 F.2d at 70-73.  See also In re Silicone Gel Breast Implants Prods. Liab. Litig., 174 F. Supp. 2d 1242, 1250 (N.D. Ala. 2001) (summarizing the purpose and structure of the MSP statute).

[14] § 1395y(b)(2)(A) (emphasis added).

8

that payment for such item or service has been or could be made under such subparagraph. . . .

(ii) Action by United States

In order to recover payment under this subchapter for such an item or service, the United States may bring an action against any entity which is <u>required or responsible</u> (directly, as a third-party administrator, or otherwise) to make payment with respect so such item or service (or any portion thereof) under a <u>primary plan</u> . . ., or against any other entity (including any physician or provider) that has received payment from that entity with respect to the item or service, and may join or intervene in any action related to the events that gave rise to the need for the item or service. . . .[15]

Thus, the structure of the MSP statute is relatively simple. If a Medicare recipient has medical insurance provided through a "primary plan," then Medicare is precluded from paying for medical services except to provide secondary coverage. Stated differently, Medicare serves as a back-up insurance plan to cover that which is not paid for by a primary insurance plan.

A "primary plan" is defined as a group health insurance plan, or as any another type of insurance <u>plan</u>, such as workman's compensation, liability insurance, or a self-insurance plan, that may reasonably be expected to pay for services promptly. "Promptly" is defined by the Health Care Financing Administration ("HCFA") regulations as payment within 120 days after the <u>earlier</u> of (1) the date the claim is filed, or (2) the date the service was provided or the patient was discharged from the hospital.[16] If the

---

[15] § 1395y(b)(2)(B) (emphasis added).

[16] 42 C.F.R. § 411.50(b).

Medicare program chooses to make conditional payments when a Medicare recipient has coverage under a primary plan, then the government may seek reimbursement for these payments by suing the insurance entities that provide the primary coverage.

To entice us to consider the lengthy and abstruse legislative history of the MSP statute, the government urges us to agree with it that the statute is ambiguous; however, we decline to find ambiguity where none exists.[17] As ably pointed out by Zimmer and amici curiae, the term "self-insurance plan," as used in the MSP statute, is not only clear in its meaning; it plainly does not apply automatically to alleged tortfeasors, such as Zimmer, who settle with plaintiffs. Although we agree with the district court's determination that Zimmer is not liable under the MSP statute because it could not be reasonably expected to pay "promptly" for Loftin's medical care, we also agree with the other district courts that have concluded that an alleged tortfeasor who settles with a plaintiff is not, ipso facto, a "self-insurer" under the MSP statute. We are compelled to draw this conclusion when we apply several well-established canons of statutory interpretation.

First, the term "self-insurance plan" does not exist in a vacuum within the MSP statute. Rather, it is predicated on the

---

[17] A prior district court also rejected the government's attempt to rely upon the MSP statute's legislative history, noting then that the "legislative history of the MSP Statute is cryptic and uninformative on the interpretative question now raised." Mason v. American Tobacco Co., 212 F. Supp. 2d 88, 93 (E.D. N.Y. 2002).

10

term "primary plan."  As the MSP statute plainly provides, Medicare is a secondary provider of insurance <u>if</u> <u>and</u> <u>only</u> <u>if</u> a Medicare recipient has another source of medical coverage under a "primary plan."  The term "primary plan" is pivotal to the applicability of the MSP statute –– its reimbursement provisions are not triggered unless a Medicare recipient's source of recovery meets the definition of "primary plan," regardless of whether that source is a group healthcare plan, workman's compensation, liability insurance, or a self-insurance plan.

The government asks us to accept its interpretation of "self-insurance plan" without reference to the more fundamental requirement of the MSP statute that this type of insurance plan constitute a "primary plan."  To do so would violate the most basic principle of statutory construction: Unless indicated otherwise in a statute, its words are to be given their ordinary meaning, which "cannot be determined in isolation, but must be drawn from the context in which [they are] used."[18]  This maxim is particularly apposite here because the MSP statute does not define the term "self-insurance plan"; neither does it define a "primary plan" beyond listing some examples of various types of plans that are deemed primary.

We must, accordingly, look to the ordinary meaning of these

---

[18] <u>United States v. Lyckman</u>, 235 F.3d 234, 238 (5th Cir. 2001).

terms.[19]  A "plan" denotes "a method for achieving an end" or "a detailed formulation of a program of action."[20]  "An insurer is the party to a contract of insurance who assumes the risk and undertakes to indemnify the insured, or pay a certain sum on the happening of a specified contingency."[21]  Therefore, in the sense used in the MSP statute, a "primary plan" of "self-insurance" requires an entity's <u>ex</u> <u>ante</u> adoption, for itself, of an arrangement for (1) a source of funds and (2) procedures for disbursing these funds when claims are made against the entity.[22]

---

[19] <u>See</u> <u>INS v. Phinpathya</u>, 464 U.S. 183, 189 (1984) (noting that "in all cases involving statutory construction, our starting point must be the language employed by Congress, . . . and we assume that the legislative purpose is expressed by the ordinary meaning of the words used") (quotations and citations omitted); <u>White v. Black</u>, 190 F.3d 366, 368 (5th Cir. 1999) ("The canons of statutory construction dictate that when construing a statute, the court should give words their ordinary meaning and should not render as meaningless the language of the statute.") (citation omitted).

[20] <u>Webster's Ninth New Collegiate Dictionary</u> 898 (Merrian-Webster 1985).  Dictionaries are a principal source for ascertaining the ordinary meaning of statutory language, <u>see generally</u> <u>Babbitt v. Sweet Home Chapter of Communities for a Great Oregon</u>, 515 U.S. 687 (1995) (invoking dictionaries by both the majority and the dissent in defining terms in the Endangered Species Act).

[21] 3 COUCH ON INSURANCE 39:1 (3d 2002).

[22] <u>See</u> <u>In re Orthopedic Bone Screw Prods. Liab. Litig.</u>, 202 F.R.D. 154, 166 (E.D. Penn. 2001) (noting that a "'plan' connotes some type of formal arrangement . . . to set aside funds to cover potential future liabilities and a formal procedure for processing claims made against that fund"); <u>In re Diet Drugs</u>, 2001 WL 283163, at *10 (E.D. Penn. 2001) (noting that "the existence of a primary 'plan' connotes some type of formal arrangement").

Recognizing that "[t]he term 'self-insurance' had no precise legal meaning," a leading insurance treatise nonetheless confirms this definition of "self-insurance," noting that

> to meet the conceptual definition of self-insurance, an entity would have to engage in the same sorts of underwriting procedures that insurance companies employ; estimating likely losses during the period, setting up a mechanism for creating sufficient reserves to meet those losses as they occur, and, usually, arranging for commercial insurance for losses in excess of some stated amount.[23]

Thus, according to the ordinary meaning of the terms of the MSP statute, it is wrong for the government to contend that an entity's negotiating of a single settlement with an individual plaintiff is sufficient, in and of itself, for such entity to be deemed as having a "self-insurance plan."

In addition, the regulations promulgated under the MSP statute by the HCFA reflect the ordinary meaning of a "self-insurance plan." The HCFA regulations define a "plan" as "any arrangement, oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury or illness."[24] The regulations further define a "self-insurance plan" as "a plan under which an individual, or a private or governmental

---

[23] 1 COUCH ON INSURANCE 10:1 (3d 1997). See also Alderson v. Ins. Co. of N. Am., 223 Cal. App. 3d 397, 407 (1990) (noting that "[i]t is implicit in the term, 'self-insurer,' that such person maintains a fund, or a reserve, to cover possible losses, from which it pays out valid claims, and that the self-insurer have a procedure for considering such claims and for managing that reserve").

[24] 42 C.F.R. § 411.21.

entity, carries its own risk instead of taking out insurance with a carrier."[25]  It is clear from the regulations implementing the MSP statute that the existence of a self-insurance plan requires that there by some form of arrangement —— the creation <u>ex</u> <u>ante</u> of a fund and distribution procedures —— for making potential payments to a set of prospective claimants.  The HCFA regulations even speak in <u>prospective</u> terms.  For example, § 411.21 defines a "plan" as an "arrangement . . . <u>to</u> <u>provide</u> health benefits or assume legal liability."  Such language contemplates a pre-arrangement and makes sense only if a self-insurer creates or maintains a fund or source and establishes rules for making disbursements therefrom in covering the self-insurer's future risk, i.e., when one acts as an insurance carrier for onself.[26]

Furthermore, the well-known interpretative canon, <u>expressio unius est exclusio alterius</u> —— "the expression of one thing implies the exclusion of another"[27] —— confirms that the government is advocating an unreasonably broad interpretation of the MSP statute. The MSP statute explicitly speaks in terms of <u>insurance</u> <u>plans</u> that provide <u>primary</u> medical coverage.  Nowhere does the MSP statute mention or even suggest that an alleged tortfeasor who settles a

---

[25] 42 C.F.R. § 411.50(b) (emphasis added).

[26] <u>See</u> <u>Silicone Gel Breast Implants</u>,174 F. Supp. 2d at 1254 (noting that "the regulatory language defining 'self-insured plan' connotes some type of formal arrangement by which funds are set aside and accessed to cover future liabilities").

[27] 73 AM. JUR. 2d <u>Statutes</u> § 129 (2002).

14

single claim with a single plaintiff falls within the ambit of the statute's category of a self-insurance "plan." The failure of Congress to include in the MSP statute a right of action for reimbursement of medical expenditures against tortfeasors indicates that this statute "plainly intends to allow recovery only from an insurer."[28]

This application of expressio unius to the MSP statute is further supported by the canon that instructs courts to adopt harmonious interpretations of statutes addressing similar subjects.[29] In this respect, the Medical Care Recovery Act[30] ("MCRA") explicitly provides for the right of action that the government is attempting to read into the MSP statute. The MCRA expressly arms the government with a right to recover medical payments that it has made "under circumstances creating a tort liability upon some third person."[31] In such instances, the government may "institute and prosecute legal proceedings against the third person who is liable for the injury or disease . . . for

---

[28] Health Ins. Ass'n v. Shalala, 23 F.3d 412, 427 n.* (D.C. Cir. 1994) (Henderson, J., concurring) (emphasis added).

[29] 73 AM. JUR. 2d Statutes § 168 (2002). We recently recognized that "we should attempt to give horizontal coherence to the United States Code and ensure that different statutes interact coherently and harmoniously." Murphy v. Penn. Higher Educ. Assistance Agency & Educ. Mgmt. Credit Corp., 282 F.3d 868, 872 (5th Cir. 2002) (citing Pierce v. Underwood, 487 U.S. 552, 561-63 (1988)).

[30] 42 U.S.C. § 2651-53 (2002).

[31] § 2651(a).

15

the payment or reimbursement of medical expenses or lost pay . . . ."[32]  In express terms, then, the MCRA affords the government the legal right of recovery that it is urging us to read into the MSP statute, which is silent on the point.  The express inclusion of recovery from tortfeasors in the MCRA supports the conclusion that Congress's omission of tortfeasors from the list of those potentially liable under the MSP statute was knowing and intentional.[33]

Recognizing the government's attempt to fold the MCRA into the MSP, the In re Diet Drugs court noted that

> [u]nlike the MCRA, the MSP does not mention a right by the Government to recover from a tortfeasor.  Rather, the express wording of the [MSP] statute creates a cause of action only against insurers and their payees. . . .  Under the Government's construction of the [MSP] statute, every tortfeasor that used its general assets to fund a tort settlement with persons who had received federal health care benefits would be potentially liable under the MSP.  There is simply no support for this extremely broad construction of the [MSP] statute.[34]

When faced with two statutes on similar subjects, courts must,

---

[32] § 2651(b).

[33] Cf. In re Dow Corning Corp., 250 B.R. 298, 339 (Bankr. E.D. Mich. 2000) (noting that the court is "dubious that the term 'self-insured plan' covers or was meant to cover every tortfeasor who fails to obtain insurance"); 54 Fed. Reg. 41727 (Oct. 11, 1989) (responding to a comment that explicitly asks for clarification on whether an alleged tortfeasor is liable under the MSP statute as a "self-insurer," the HFCA notes that "the mere absence of insurance purchased from a carrier does not necessarily constitute a 'plan' of self-insurance").

[34] 2001 WL 283163, at *10 (citations omitted).

whenever possible, interpret them so as to give effect to both.[35]

Yet, if we were to adopt the broad construction of the MSP statute urged by the government in this case, we would, in effect, eliminate the need for the MCRA, or at least condemn some of Congress's language in the MCRA to the scrap heap of surplusage. This would be unacceptable, particularly when a completely reasonable interpretation of the MSP statute is offered by the plain terms of the statute itself. As a district court noted in rejecting another government attempt to read MCRA authority into the MSP statute: "[I]t is clear that Congress did not intend MSP to be used as an across the board procedural vehicle for suing tortfeasors."[36]

By its plain terms, the MSP statute and the HCFA regulations predicate reimbursement liability on the existence of a primary insurance plan. In its First Amended Complaint, the government obfuscates this fact when it cabins the MSP statute's requirements as applying to those entities that have only "primary payment responsibility."[37] More important, in its specific count against

---

[35] United States v. Borden, 308 U.S. 188, 198 (1939) ("When there are two acts upon the same subject, the rule is to give effect to both if possible.").

[36] Philip Morris, Inc., 116 F. Supp. at 135. See also Orthopedic Bone Screw, 202 F.R.D. at 165 ("Unlike the MCRA, the MSP does not mention a right by the government to recover from a tortfeasor.").

[37] In its discussion of the HCFA regulations later in the complaint, the government acknowledges that a "third party payer" must possess an "insurance policy, plan . . ., or program that is

17

Zimmer, the government <u>never</u> alleges that Zimmer paid Goetzmann and Loftin according to a pre-existing <u>plan</u>; it asserts only the conclusions that Zimmer was "responsible to pay for Defendant Loftin's medical expenses" and that Zimmer "was self-insured for its liability to Loftin." As the D.C. district court noted in granting a motion to dismiss by a similarly situated defendant corporation in a parallel case: "In fact, the Complaint does not even allege the existence of any <u>elements</u> of a 'primary plan,' such as a 'plan' or 'arrangement.'"[38]

Even when we liberally construe the government's complaint, as we must, we see that the MSP statute and its implementing regulations require a primary insurance <u>plan</u>. But Zimmer has only negotiated a discrete settlement with a single plaintiff and paid that plaintiff accordingly. It is simply a <u>non sequitur</u> for the government to infer from "payment responsibility" in tort a pre-existing <u>primary plan</u> of self-insurance. In considering the government's allegations against Zimmer under the MSP statute, we are compelled to pose the rhetorical question, where's the plan?[39]

_____

primary to Medicare" in order to be liable under the MSP statute, citing 42 C.F.R. § 411.21. The government, however, never indicates how this essential legal element for liability under the MSP statute applies to Zimmer in this case.

[38] <u>United States v. Philip Morris, Inc.</u>, 116 F. Supp. 2d 131, 145 (D.D.C. 2000) (original emphasis).

[39] <u>See</u> <u>Orthopedic Bone Screw</u>, 202 F.R.D. at 165-66 (noting that the "Government's argument . . . fails to account for the repeated use of the word 'plan' throughout the MSP and regulations promulgated thereunder").

Beyond oblique references to Zimmer's responsibility to pay Loftin, the existence of a "primary plan" is nowhere to be found in the government's complaint against Zimmer.

On appeal, the government repeatedly (but in isolation) quotes the MSP statute's phrase that an entity which is "required or responsible" for paying for a Medicare recipient's healthcare expenses is liable to reimburse the government. Ergo, the government urges, Zimmer is arguably liable under the MSP statute, or at least there is a basis for inferring potential liability sufficient to survive a Rule 12(b)(6) motion to dismiss. Yet, litigants cannot cherry-pick particular phrases out of statutory schemes simply to justify an exceptionally broad — and favorable — interpretation of a statute.[40] As the D.C. district court held only one year ago in a similar case litigated by the government under the MSP statute, "MSP liability attaches only to an entity that is 'required or responsible' to pay under a 'primary plan.'"[41] As we already noted, nothing in the government's pleadings can be read to support the conclusional allegation that Zimmer maintained such "primary plan" of self-insurance for paying claimants such as

_____

[40] "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (quoting Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 809 (1989)).

[41] United States v. Philip Morris, Inc., 156 F. Supp. 2d 1, 4 (D.D.C. 2001) (citing 42 U.S.C. § 1395y(b)(2)) (emphasis added).

19

Loftin.[42]  According to the plain terms of the MSP statute and the HCFA regulations, therefore, Zimmer can have no MSP liability.

    3.    No <u>Chevron</u> Deference for the Government's Interpretation of the MSP Statute.

The government further argues that the term "self-insurance plan," as used in the MSP statute, is ambiguous, entitling the agency's own interpretation to <u>Chevron</u> deference.[43]  According to the government, this is particularly relevant because Zimmer is a "large and sophisticated manufacturer of medical devices."  As such, Zimmer's status as a "large corporation" permits a reasonable inference that Zimmer "can readily be regarded as self-insured." The government concludes that this is a reasonable interpretation of the MSP statute's ambiguous terms and legislative history, to which we must defer.

We reject this effort by the government to clothe itself in the deference given to agencies' reasonable interpretations of ambiguous statutory provisions.  First, the clarity of the MSP

---

[42] On appeal, the government submits a copy of a portion of the 10-K filing by Zimmer's parent corporation, Bristol-Myers Squibb Company ("Bristol-Myers"), showing that Bristol-Myers has obtained insurance coverage for a substantial number of <u>breast-implant</u> products-liability claims.  Beyond another oblique argument that this 10-K filing reveals that Bristol-Myers has arranged for additional insurance coverage, the government fails to explain how this is relevant to whether Zimmer settled Loftin's discrete <u>hip-prosthesis</u> product-liability lawsuit under a "primary plan" of "self-insurance."

[43] <u>Chevron U.S.A. v. Natural Res. Def. Council</u>, 467 U.S. 837, 843-44 (1984) (holding that courts must defer to an agency's "permissible construction" or "reasonable interpretation" of ambiguous statutory terms).

statute's terms readily discloses the statute's plain meaning, eschewing the label of ambiguity. Thus, there is no need even to consider <u>Chevron</u> deference because the government's argument fails the first prong of the analysis for granting such deference — the determination that a statutory grant of authority to a regulatory agency is ambiguous. As the <u>Chevron</u> court recognized, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[44]

Second, even if the MSP statute were ambiguous and we were to consider legislative history and the agency's regulations, and conclude that the HCFA regulations would support the government's appellate argument that Zimmer's settlement agreement with Loftin constituted a primary self-insurance plan, there is simply no statutory support for the government's position that uninsured "sophisticated corporations" are <u>per se</u> self-insurers. There is no language in the MSP statute justifying a distinction between a "sophisticated corporation" and an individual or small business. The government does not invite our attention to anything that could serve as a statutory hook on which to hang this argument. In fact, the government has already attempted to sell this argument to

---

[44] <u>Id.</u> at 842-43. Notably, the Court recognized that the meaning of a statute is ascertained by "employing traditional tools of statutory construction," such as the above-referenced canons. <u>Id.</u> at 843, n.9.

21

district courts in New York and D.C., but to no avail.[45] It offers us no reason why we should reject or depart from these previous judicial decisions. In summary, the government's proffered interpretation of the MSP statute, as it currently stands, constitutes nothing more than "the litigation position of agency counsel that is wholly unsupported by regulations, rulings, or administrative practice [and thus] is not entitled to deference" by this or any court.[46]

4. Zimmer Cannot Pay for Medical Services "Promptly," and Thereby Fails the MSP Statute's Requirement for a "Self-Insurance Plan."

The district court determined that Zimmer does not possess a "self-insurance plan" because it could not reasonably be expected to pay Loftin's healthcare claim "promptly," as required under the MSP staute.[47] The MSP statute provides for reimbursement of conditional expenditures by Medicare for medical services in which

---

[45] See Mason, 212 F. Supp. 2d at 92; Philip Morris, 156 F. Supp. 2d at 7.

[46] Silicone Gel Breast Implants, 174 F. Supp. 2d at 1249 (citing Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 211 (1988)). See also Orthopedic Bone Screw, 202 F.R.D. at 164 (denying Chevron deference to the government's interpretation of the MSP statute and regulations).

[47] See Diet Drugs, 2001 WL 283163, at 11 n.20 (discussing how an alleged tortfeasor could not be "reasonably expected" to pay for health care expenses "promptly," as is required of a "primary plan" under the MSP statute and the HCFA's regulations); Orthopedic Bone Screw, 202 F.R.D. at 167-69 (same); Dow Corning Corp., 250 B.R. at 348 n.29 (same).

another primary plan is "reasonably expected" to pay "promptly."[48] The HCFA's regulations define a "prompt" payment as one that occurs within 120 days of either the date the claim is filed or the date of the medical treatment itself, whichever is earlier.[49] As a district court in Pennsylvania remarked on this same issue:

> Given the time delay inherent in strongly prosecuted and defended tort litigation, the Government cannot legitimately assert that a settlement arrived at in the heat of a hard fought adversarial engagement for alleged tort liability from a defective product is the type of insurance "plan" that the Government can reasonably expect to make prompt payment for medical care.[50]

Similarly, a bankruptcy court observed that "[i]t would seem to be folly for the Government to argue that, when it made the Medicare payments in question, there was a reasonable expectation that [an alleged tortfeasor] would promptly pay for such medical care."[51] In the instant case, the statutory requirement that a primary insurance plan pay within 120 days of a claim for medical care unquestionably precludes our holding Zimmer potentially liable as a "self-insurer."[52]

---

[48] § 1395y(b)(2)(A)(ii).

[49] 42 C.F.R. § 411.50(b).

[50] Orthopedic Bone Screw, 202 F.R.D. at 167.

[51] Dow Corning Corp., 250 B.R. at 348, n.29.

[52] As the Orthopedic Bone Screw court poignantly observed, "the other types of insurance included in the definition of a 'primary payer' under § 1395y(b)(2)(A), i.e., workmen's compensation, automobile and no fault insurance, are frequently required by the terms of the policy itself to make prompt payment for medical expenses. See, e.g., 47 Fed. Reg. 21103 (stating

We must disagree nonetheless with the district court's suggestion that it is wrong to determine, on a motion to dismiss, whether an alleged tortfeasor who enters into a settlement agreement is, ipso facto, a "self-insurer." This is an issue of statutory interpretation; accordingly, a court may determine, as a matter of law, whether an alleged tortfeasor is a "self-insurer" under the MSP statute.[53] Thus, the district court would have been justified in dismissing the complaint solely on the basis of the government's failure to allege in its complaint the essential statutory element that Zimmer actually had in place a primary insurance plan.[54] We have determined, on the basis of the government's pleadings, that Zimmer is not a "self-insurer" under the MSP statute. Even when construed liberally in favor of the

---

that 'under automobile medical or no fault insurance, payment can frequently be foreseen with reasonable certainty')." 202 F.R.D. at 168, n.14.

[53] Chevron, 467 U.S. at 843, n.9 (noting that the "judiciary is the final authority on issues of statutory construction"); Texas Beef Group v. Winfrey, 201 F.3d 680, 692 (5th Cir. 2000) (Jones, J., concurring) (noting that the district court's determination of "the scope of the Act . . . remain questions of law that the court must determine pursuant to the rules of statutory construction").

[54] See Mason, 212 F. Supp. 2d at 91-94 (granting defendant's motion to dismiss the government's complaint under the MSP statute given its sole allegation that defendant is only a sophisticated corporate tortfeasor); Philip Morris, Inc., 156 F. Supp. 2d at 7 (granting defendant's motion to dismiss the government's complaint given its failure to allege a "self-insured plan"); Philip Morris, Inc., 116 F. Supp. 2d at 144-46 (granting defendant's motion to dismiss the government's complaint given the government's failure to allege that the defendant had a "self-insured plan").

government as plaintiff, its complaint's allegations do not rise to the level of showing the existence of a "primary plan" of self-insurance.[55]  Even so, the district court was correct in holding that the MSP statute's requirement of "prompt" payment is a valid basis for precluding per se liability for an alleged tortfeasor under the MSP statute.

C.   Goetzmann and Loftin's Reimbursement Liability Under the MSP Statute.

1.   Standard of Review.

We review a grant of summary judgment de novo, applying the same standard as the district court.[56]  A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact.[57]  A fact issue is material if its resolution could affect the outcome of the action.[58]  In deciding whether a fact issue has been created, we view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.[59]

---

[55] Cf. Conticommodity Serv., Inc. v. Ragan, 63 F.3d 438, 442 (5th Cir. 1995) (affirming the grant of summary judgment "on grounds other than the basis of the district court's decision").

[56] Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).

[57] Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[58] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[59] See Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999).

25

The standard for summary judgment mirrors that for judgment as a matter of law.[60] Thus, we must review all of the evidence in the record, but make no credibility determinations or weigh any evidence.[61] In reviewing all the evidence, we must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as the evidence supporting the moving party that is uncontradicted and unimpeached.[62] The nonmoving party, however, cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence.[63]

2. Goetzmann and Loftin are not Required to Reimburse the Government Because They did Not Receive Payment from an Insurer.

The government asserts a right of recovery against Goetzmann and Loftin based on their receipt of monies from Zimmer pursuant to the terms of the settlement agreement. "Under the MPSA, the United States is limited to pursuing an independent right of recovery against two types of entities: a 'primary plan;' or an entity that

---

[60] Celotex Corp., 477 U.S. at 323.

[61] Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000).

[62] Id. at 151.

[63] Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

26

has received payment from a primary plan."[64]  As neither Goetzmann nor Loftin can be found to have received monies from an entity —— Zimmer —— that distributed funds under a "primary plan," neither Goetzmann nor Loftin can be required to reimburse the government under the MSP statute.

### III. CONCLUSION

This case is the latest illustration of the government's refusal to accept the burgeoning weight of jurisprudence comprising at least seven judicial rejections of its repeated attempts to have the MSP statute construed beyond its plain terms.  Six federal district courts and one bankruptcy court have already rejected the government's interpretation of the MSP statute to include alleged tortfeasors who settle with injured plaintiffs.[65]  In this case, the government brings nothing new to the table in support of the very same interpretation of the MSP statute that it has repeatedly advanced and had repeatedly rejected by the courts.  Rather, the government simply regurgitates yet again the same unavailing arguments.

We appear to be the first appellate court to address this

---

[64] Dow Corning Corp., 250 B.R. at 337 (citing cases).  See also Silicone Gel Breast Implants, 174 F. Supp. 2d at 1253 (noting that "[t]he express wording of the [MSP] statute creates a cause of action against insurers and their payees").

[65] See generally Mason, 212 F. Supp. 2d at 91-93; Silicone Gel Breast Implants, 174 F. Supp. 2d at 1250-59; Philip Morris, 156 F. Supp. 2d at 3-8; Orthopedic Bone Screw, 202 F.R.D. at 163-69; Diet Drugs, 2001 WL 283163, at *9-*12; Philip Morris, 116 F. Supp. 2d at 144-46; Dow Corning Corp., 250 B.R. at 335-42, 348.

27

issue, but we see no valid reason to depart from the numerous trial courts' adept analyses of the MSP statute and its implementing regulations. Although we might applaud its motive in seeking to recoup funds it has disbursed for Medicare treatment and services, the government's desire to expand the list of those responsible for reimbursement likely should be directed to Congress rather than to the courts, lest future repetitions be met with sanctions for unnecessarily protracting baseless or even frivolous litigation. As the In re Dow Corning Corp. court noted:

> Despite the relatively simple structure of the MSP [statute], it has generated considerable case law. . . . [S]adly, a significant amount of the legal melee is the direct result of the Government urging statutory constructions, as it has done in this case, that are entirely unsupported by the statute and which appear to be intended to convert the MSP [statute] from an important and sensibly fashioned fiscal cost-cutting measure into a mere, heavy-handed collection tool.[66]

When the instant case is reduced to basics, the government's allegations do not depict Zimmer as having had acted under a primary self-insurance plan when it settled with Loftin. Zimmer was simply an alleged tortfeasor — nothing more and nothing less. Loftin, through her attorney, Goetzmann, was simply a plaintiff in a products-liability lawsuit who, through Goetzmann, agreed to settle with the defendant rather than proceeding to trial. As alleged, the settlement reached between Zimmer and Loftin was a discrete agreement, the result of nothing more than the parties'

---

[66] Dow Corning Corp., 250 B.R. at 336 n.21.

28

particular litigation tactics in this one case.  In fact, the government does not allege anywhere in its complaint that Zimmer paid Goetzmann and Loftin according to a pre-existing primary plan of self-insurance.  The conclusion is thus inescapable:  These three parties are well outside the scope of the MSP statute.  For the foregoing reasons, the district court's dismissals of the government's claims against Zimmer under Rule 12(b)(6), and against Goetzmann and Loftin via summary judgment, are, in all respects, AFFIRMED.