**Jeannette D. BROWN, Plaintiff–Appellant,**

v.

**Tommy G. THOMPSON, Secretary, Department of Health and Human Services, Defendant–Appellee.**

Virginia Trial Lawyers Association,
Amicus Supporting Appellant.

No. 03–1588.

United States Court of Appeals,
Fourth Circuit.

Argued: May 6, 2004.

Decided: July 7, 2004.

**ARGUED:** Peter Aull Cerick, Herndon, Virginia, for Appellant. Steven E. Gordon, Assistant United States Attorney, Office of the United States Attorney, Alexandria, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellee. Benjamin W. Glass, III, Robert Mann, Yvonne T. Griffin, Julia Brasfield, Fairfax, Virginia, for Amicus Supporting Appellant.

Before MOTZ and SHEDD, Circuit Judges, and Pasco M. BOWMAN, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Judge MOTZ wrote the opinion, in which Judge SHEDD and Senior Judge BOWMAN joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge.

A recipient of Medicare benefits appeals an order requiring her to reimburse the Secretary of the Department of Health and Human Services for the amount of those benefits, from a malpractice settlement she received from one of her health care providers. The district court concluded that federal law, specifically the Medicare Secondary Payer provisions of the Medicare Act, entitled the Secretary to such reimbursement. *See Brown v. Thompson*, 252 F.Supp.2d 312 (E.D.Va. 2003). We affirm, albeit on somewhat different grounds than those relied on by the district court.

### I.

Jeannette D. Brown received medical treatment on August 6 and 8, 2000 from health care facilities owned and operated by Kaiser Foundation Health Plan for the Mid–Atlantic States ("Kaiser"). On August 9, Brown was admitted to the Fairfax Hospital emergency room for a perforated sigmoid colon and significant sepsis, where she remained for forty-two days. The Secretary made Medicare payments to Brown for medical services rendered during this hospitalization.

In February 2001, Brown filed a medical malpractice suit against Kaiser in state court, alleging that the Kaiser physicians provided negligent care in failing to promptly admit her to a hospital. Several months later, Brown notified a Medicare intermediary by letter of the potential to recover those payments made as a result of the malpractice.[1] Brown's letter asked Medicare to submit an itemized statement of its claims for reimbursement. The intermediary replied, providing an initial estimate of its claims incurred as a result of the malpractice and notifying Brown that "Medicare's claim must be paid up front out of settlement proceeds before any distribution occurs."

A few days before the scheduled January 2002 trial date of the state malpractice case, Brown settled her claims against Kaiser for $285,000. Thereafter, Brown and the Medicare intermediary exchanged letters disputing the exact amount Medicare should be reimbursed from the settlement proceeds. After several such letters, however, Brown informed the intermediary that she had decided to "decline[ ] payment" altogether because it had "come to [her] attention that a number of cases have held that Medicare is not entitled" to reimbursement where no "prompt primary pay[e]r of medical bills" existed.

A month later, Brown filed the complaint in this case, seeking a declaratory judgment that the Secretary had no claim to her medical malpractice settlement proceeds or, alternatively, that the Secretary must adjust his claim downward. The parties ultimately entered into a stipulation

---

**1.** Medicare intermediaries are private organizations that commonly act as fiscal intermediaries under contracts with the Secretary to facilitate payments to Medicare. 42 U.S.C. § 1395h (2000).

agreeing to the reimbursement amount owed to the Secretary, if he did, indeed, have a claim to Brown's settlement proceeds.

The district court, then, had before it only two questions: (1) whether the Medicare Secondary Payer provisions entitled "the Secretary to claim a portion of the Kaiser settlement payment as reimbursement for the earlier Medicare payments occasioned by the malpractice, given that at the time the Medicare payments were made, the settlement was not reasonably expected to be paid promptly," and (2) "[w]hether the Kaiser self-insured plan, which funded the malpractice settlement, qualifies as a 'primary plan' under" these provisions. *Brown*, 252 F.Supp.2d at 314. The district court answered both questions in the affirmative and granted summary judgment to the Secretary. *Id.* at 320–21. Brown timely appealed. In resolving her appeal, we address each issue in seriatim.

## II.

■ In 1980, Congress initiated a series of amendments to the Medicare Act, 42 U.S.C. §§ 1395–1395hhh, designed to "reduce Medicare costs by making the government a secondary provider of medical insurance coverage when a Medicare recipient has other sources of primary insurance coverage." *Thompson v. Goetzmann*, 337 F.3d 489, 495 (5th Cir.2003). These amendments have been codified at 42 U.S.C. § 1395y(b)(2) and are referred to as the Medicare Secondary Payer provisions ("MSP"). The question of statutory interpretation before us on appeal arises from an amendment made to MSP in 1989. *See* Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101–239, § 6202(b)(1), 103 Stat. 2106, 2229.

## A.

■ In particular, Brown advances an interpretation based on two portions of MSP, as it existed after 1989:(1) the word "promptly" in 42 U.S.C. § 1395y(b)(2)(A)(ii) (2000) ("subparagraph (A)(ii)"), and (2) the phrase "to which subparagraph (A) applies" in 42 U.S.C. § 1395y(b)(2)(B)(i) (2000) ("subparagraph (B)(i)"). Read together, Brown argues that these phrases mean that Medicare has no right to reimbursement of a payment made by a primary plan listed in subparagraph (A)(ii) (a list that contains a "liability insurance policy or plan (including a self-insured plan)") unless Medicare could have reasonably expected that primary plan to pay *promptly* at the time medical services were provided. § 1395y(b)(2)(A)(ii), (B)(i).

Regulations of the Health Care Financing Administration ("HCFA") (now Centers for Medicare and Medicaid Services) provide that a payment is made "promptly" if made within 120 days after the earlier of the date the care was provided or the date a claim was filed with the insurer. 42 C.F.R. §§ 411.21, 411.50 (2000). Because, in the present case, Kaiser could not reasonably have been expected to make any payment to Brown within 120 days of the medical services provided (and, indeed, Kaiser did not agree to settle with Brown for more than a year after providing her medical services), the adoption of Brown's interpretation of MSP would mean that Brown was not required to reimburse Medicare out of her settlement proceeds for the payments Medicare made for Brown's care. The district court rejected this argument and instead concluded that the prompt payment language in MSP simply controls when Medicare may withhold payment in the first instance, not when it may seek reimbursement. *See Brown*, 252 F.Supp.2d at 319–20.

At the time the parties filed their initial briefs in this case, the courts were divided on whether Brown's was an appropriate

interpretation of MSP. *Compare United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 885–93 (11th Cir.2003) (holding that, under MSP, "*any* payment that Medicare does make is secondary and is subject to reimbursement from sources of primary coverage under the statute," regardless of whether those sources can be expected to pay promptly) (emphasis added), *with Goetzmann*, 337 F.3d at 492 (noting, in dicta, "that the plain language of the MSP statute makes the reasonable expectation of a prompt payment a requirement for" reimbursement, but that this plain language arguably produced an "absurd result"), *and In re Orthopedic Bone Screw Prod. Liab. Litig.*, 202 F.R.D. 154, 167–69 (E.D.Pa.2001) (holding that MSP "by its terms limits the Government's right to reimbursement to situations in which prompt payment has been made or can reasonably be expected by a 'primary plan'"); *see also Estate of Urso v. Thompson*, 309 F.Supp.2d 253, 256–59 (D.Conn.2004) (agreeing with the conclusion reached in *Baxter*).

On December 8, 2003, however, the President signed into law amendments to MSP designed to resolve this dispute. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.L. No. 108–173, § 301, 117 Stat.2066, 2221 (2003) (hereinafter "MMA"). The amendments to MSP enacted in MMA removed the two elements that had resulted in these conflicting interpretations, i.e., the word "promptly" in subparagraph (A)(ii) and the cross-reference to subparagraph (A) in subparagraph (B)(i). *Compare* 42 U.S.C. § 1395y(b)(2)(A)(ii), (B)(i) (2000) *with* 42 U.S.C. § 1395y(b)(2)(A)(ii), (B)(i)-(ii) (West, WESTLAW through May 28, 2004).

■ In its current form, MSP clearly provides that the reasonable expectation of a prompt payment is not a requirement for reimbursement. MSP now states unequivocally that "[a] primary plan, and an entity that receives payment from a primary plan, shall reimburse" Medicare for any payment made by Medicare "with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service." § 1395y(b)(2)(B)(ii). It further states that "[a] primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." *Id.*

We requested and received supplemental briefing from the parties addressing the consequences of MMA. Brown does not attempt to apply her interpretation to MSP's current statutory language, i.e., the language as amended by MMA. Indeed, Brown conceded at oral argument that this new language plainly entitles Medicare to reimbursement of any payment it makes for medical services if a primary plan later pays for those medical services as part of a settlement agreement—regardless of whether that primary plan could have been expected to pay promptly when medical services were provided.

■ Nonetheless, Brown contends that the enactment of MMA does not defeat her argument. She maintains that MMA constituted a substantive change in the law, and that we cannot, consistent with due process, retroactively apply this changed law to her. *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 266, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (recognizing that the Due Process Clause "protects the interests in fair notice and repose that may be compromised by retroactive legisla-

tion"). The Secretary, on the other hand, asserts that MMA merely clarified existing law, and that hence constitutional concerns about retroactive application do not arise. *See, e.g., ABKCO Music, Inc. v. LaVere,* 217 F.3d 684, 691 (9th Cir.2000); *Liquilux Gas Corp. v. Martin Gas Sales,* 979 F.2d 887, 890 (1st Cir.1992). Accordingly, we turn to the question of whether MMA constitutes a substantive change or merely a clarification of previous law.

### B.

■■ We note at the outset that when an amendment alters, even "significantly alters," the original statutory language, this does "not necessarily" indicate that the amendment institutes a change in the law. *Piamba Cortes v. American Airlines, Inc.,* 177 F.3d 1272, 1283 (11th Cir. 1999) (internal quotation marks and citation omitted); *accord Wesson v. United States,* 48 F.3d 894, 901 (5th Cir.1995) (noting that "an amendment to a statute does not necessarily indicate that the previous version was the opposite of the amended version"). Certainly, Congress may amend a statute to establish new law, but it also may enact an amendment "to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases." *United States v. Sepulveda,* 115 F.3d 882, 885 n. 5 (11th Cir.1997) (internal quotation marks and citation omitted). As we have explained, a "change[ ] in statutory language need not *ipso facto* constitute a change in meaning or effect. Statutes may be passed purely to make what was intended all along even more unmistakably clear." *United States v. Montgomery County,* 761 F.2d 998, 1003 (4th Cir.1985).

■ In determining whether an amendment clarifies or changes an existing law, a court, of course, looks to statements of intent made by the legislature that enacted the amendment. *See, e.g., Piamba Cortes,* 177 F.3d at 1284 ("[C]ourts may rely upon a declaration by the enacting body that its intent is to clarify [a] prior enactment."); *Liquilux,* 979 F.2d at 890 (using the "legis-. lature's expression of what it understood itself to be doing" to determine whether an amendment is a clarification).

■ Most significant to our determination here, Congress formally declared in the titles of the relevant subsections of MMA that the amendments of MSP were "clarifying" and "technical." *See* MMA § 301(a)-(b). And, the legislature expressly provided in MMA that these technical and clarifying amendments be made effective "as if included in the enactment" of the MSP legislation preceding the 1989 amendments. MMA § 301(d). From this record, it is plain that Congress intended that MMA be a clarifying amendment, not a substantive change.[2]

In addition, both the Joint Conference Committee Report and the House Report clearly express Congress's intention that MMA clarify, rather than substantively change, MSP. *See* H.R. Conf. Rep. No. 108–391, at 571 (2003) (stating that the bill *"clarifies* that the Secretary may make a *conditional* Medicare payment if a ... liability insurance policy or plan (including a self-insured plan) ... cannot reasonably be expected to make prompt payment") (emphases added); H.R.Rep. No. 108–178(II), at 189 (2003) (explaining that the

---

**2.** We note that even if Congress had given no direct indication that it intended MMA to be clarifying, courts regularly view a conflict in the courts with regard to the proper interpretation of a statute—as existed with MSP here—as an indication that Congress passed a

subsequent amendment to clarify rather than change existing law. *ABKCO,* 217 F.3d at 691; *Piamba Cortes,* 177 F.3d at 1283–84; *Plyler v. Moore,* 129 F.3d 728, 736 n. 10 (4th Cir.1997)

"Secretary's authority to recover payment from any and all responsible entities" under MSP "would be *clarified*") (emphasis added); *see also* 149 Cong. Rec. S15574, S15584–85 (daily ed. Nov. 22, 2003) (statement of Sen. Grassley) (stating that MSP amendments "do *not* change existing law ... but, in fact, *clarify* the intent of Congress in protecting Medicare's resources") (emphases added).

As a clarification rather than a substantive change, MMA amounts to a declaration on the part of Congress that MSP *never*, even as it existed prior to MMA, required Medicare to reasonably expect prompt payment in order to make payments conditioned on reimbursement. The Supreme Court has long instructed that such declarations—i.e., "[s]ubsequent legislation declaring the intent of an earlier statute"—be accorded "great weight in statutory construction." *Loving v. United States*, 517 U.S. 748, 770, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) (internal quotation marks and citation omitted); *Red Lion Broad., Co. v. FCC*, 395 U.S. 367, 381–82, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (and numerous cases cited therein).[3]

Brown's only response is to argue that we need not even consider, much less accord "great weight" to, Congress's clarification in MMA because MSP, as it existed prior to MMA, was so clear as to require no further clarification.[4] We cannot, however, conclude that MSP, pre-MMA, so "unambiguously proclaimed," *Montgomery County*, 761 F.2d at 1003, the "unmistak-

able intent," *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980), of Congress to require Medicare to reasonably expect prompt payment in order to make payments conditioned on reimbursement.

We note, first, that we assess MSP's asserted lack of ambiguity not in a vacuum but in the context of a disagreement among the courts as to its proper interpretation. In fact, one of the two circuits to analyze the issue decided that the language of MSP, pre-MMA, was either ambiguous or clearly meant what the Secretary and the district court say it meant. *Baxter*, 345 F.3d at 886. Second, adopting Brown's interpretation would, as *both* circuits to have analyzed the issue have recognized, "require us to indulge the illogical premise that Congress intended" to require reimbursement only when Medicare paid "the very claims which the statute clearly contemplates that Medicare would endeavor *not* to pay." *Baxter*, 345 F.3d at 888; *see also id.* at 888 n. 15; *Goetzmann*, 337 F.3d at 492. It would also frustrate the obvious and express purpose of MSP: to "reduc[e] federal health care costs" by making "Medicare's payments ... secondary and subject to recoupment in *all* situations where one of the statutorily enumerated sources of primary coverage could pay instead." *Baxter*, 345 F.3d at 888; *accord Goetzmann*, 337 F.3d at 492; *see also* H.R.Rep. No. 96–1167, at 389 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5526, 5752.

---

**3.** We emphasize that Congress clarified the meaning of MSP in actual legislation rather than only in the "less formal types of subsequent legislative history," which constitute a "hazardous basis for inferring the meaning of a [prior] congressional enactment." *Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *see also United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 348–49, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

**4.** It is a bit disingenuous for Brown to contend that the language of MSP, pre-MMA, plainly did not require her to reimburse Medicare out of her settlement proceeds, given that she, herself, assumed MSP required such a reimbursement until she learned that a few courts had suggested otherwise.

We cannot conclude that an interpretation that leads to such counter-intuitive and tortured results is unmistakably clear.[5]

Thus, Congress's clarification of MSP in MMA was both welcome and "entitled to great weight." *Loving*, 517 U.S. at 770, 116 S.Ct. 1737. Given this "great weight"—and given, further, that the clarification in MMA furthers the obvious purpose of MSP and that Congress never gave any indication that it intended for the 1989 amendments to MSP to frustrate this purpose by eliminating Medicare's right to seek reimbursement for a "substantial subset of claims," *see Baxter*, 345 F.3d at 891—we adopt Congress' declaration in MMA as the appropriate interpretation of MSP's meaning prior to the enactment of MMA.

Accordingly, as the district court held, the fact that Medicare lacked an expectation of prompt payment from a primary plan, does not free Brown from her obligation to reimburse Medicare once a primary plan paid Brown.[6]

## III.

■ Nonetheless, Brown argues that MSP does not require her to reimburse the Secretary out of her settlement proceeds because Kaiser's asserted self-insured plan does not qualify as a "primary plan" under MSP. In response, the Secretary notes that MSP lists as an example of a "primary plan" a "liability insurance policy or plan (including a self-insured plan)." § 1395y(b)(2)(A)(ii). According to the Secretary, Kaiser funded its malpractice settlement with Brown out of a "self-insured plan" and therefore acted as a "primary plan" within the meaning of MSP.

Once again, prior to the passage of MMA, courts had divided on the question of what constituted a "self-insured plan." *Compare Baxter*, 345 F.3d at 896–98, *with Goetzmann*, 337 F.3d at 498. *See also Mason v. Am. Tobacco Co.*, 346 F.3d 36, 41–42 (2d Cir.2003). Indeed, although HCFA regulations defined "self-insured plan" as an "arrangement, oral or written . . . [to] assume legal liability for injury" under which an entity "carries its own risk instead of taking out insurance with a carrier," 42 C.F.R. §§ 411.21, 411.50(b), MSP, itself, provided no definition of "self-insured plan."

In the face of this absence of a definition in the statute, some courts held that under MSP "a 'primary plan' of 'self-insurance' requires an entity's *ex ante* adoption, for itself, of an arrangement for (1) a source of funds and (2) procedures for disbursing these funds when claims are made against the entity." *Goetzmann*, 337 F.3d at 498; *see also Mason*, 346 F.3d at 41. Others found that a self-insured plan merely had to involve some kind of "*ex ante* arrangement," but need not involve any setting aside of funds or formal procedures. *See, e.g., Baxter*, 345 F.3d at 896–98.

■ In MMA, Congress set forth with more particularity the requirements for a self-insured plan. MMA § 301(b)(1). For all of the reasons explained in Part II.B, we believe that this amendment to MSP was also clarifying. Indeed, here Brown does not, and, in fact, cannot plausibly argue that no ambiguity existed as to the

---

5. Indeed, the Ninth Circuit has noted in interpreting another provision in the Medicare Act, that "any quality of crystal clarity is uniformly recognized ·as totally absent from the Medicaid and Medicare statutes." *Beverly Community Hosp. Ass'n v. Belshe*, 132 F.3d 1259, 1265 (9th Cir.1997).

6. Because we find that MMA merely clarified the meaning of MSP as it existed before those amendments and thus are not applying MMA retroactively, we need not consider whether such retroactive application would pose any constitutional problems. *See, e.g., Piamba Cortes*, 177 F.3d at 1283; *Beverly*, 132 F.3d at 1265; *Liquilux*, 979 F.2d at 890.

meaning of self-insured plan, given that prior to MMA, the statute did not provide any definition of the term.

MMA clarified MSP by adding the following definitional sentence: "An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part." MMA § 301(b)(1). With this language—stating that a business can create a self-insured plan through its failure to obtain liability insurance—Congress has plainly indicated that the term "self-insured plan" should be given a relatively broad definition, unrestricted by formalistic requirements. *See also* H.R. Rep. No. 108–178(II), at 189–90 (stating that the reason for adding the definitional sentence was to remedy the effects of "[r]ecent court decisions" that would allow "firms that self-insure for product liability" to be "able to avoid paying Medicare for past medical payments related to the claim").

This amendment does not make entirely clear whether the absence of insurance purchased from a carrier—without some additional indication of at least an informal pre-arrangement to self-fund liability claims as they arise—suffices to create a self-insured plan.[7] However, the uncontroverted record evidence demonstrates that Kaiser *did* have what MMA clarifies will suffice to constitute a self-insured "primary plan"—an *ex ante* arrangement to pay for liability claims.

The Secretary submitted to the district court a sworn declaration from Kaiser's corporate insurance manager, Lawrence W. Owens, stating that (1) at the time of the Kaiser physicians' malpractice in August 2000, Kaiser "was self-insured for the first $5 million of each and every professional liability claim made against it"; (2) "[t]he expense for this exposure was reserved on the financial statements of [Kaiser], utilizing a formal program of self-insurance"; and (3) the "financial statement reserve amount was determined by independent actuarial review and further reviewed by [Kaiser's] auditors." Brown contends that even though Owens' declaration referred to financial statements and an actuarial review, the Secretary did not attach copies of these documents to the affidavit as required by Fed.R.Civ.P. 56(e). *See* Brief of Appellant at 40. This is correct but inconsequential, since Owens' affidavit, in and of itself, constitutes uncontradicted evidence of an "*ex ante* arrangement."

Accordingly, we agree with the district court that Kaiser's plan constitutes a self-insurance plan that meets the definition of "primary plan" under MSP.

### IV.

We, therefore, hold that the Medicare Secondary Payer provisions do entitle the Secretary to reimbursement from Brown's settlement proceeds for the Medicare payments previously paid to Brown. The order of the district court granting the Secretary summary judgment is accordingly

*AFFIRMED.*

---

7.  *See* Medicare as Secondary Payer and Medicare Recovery Against Third Parties, 54 Fed. Reg. 41716, 41727 (Oct. 11, 1989) ("We note that the mere absence of insurance purchased from a carrier does not necessarily constitute a 'plan' of self-insurance."). HFCA regulations continue to define "plan" as an "arrangement, oral or written ... [to] assume legal liability for injury," 42 C.F.R. § 411.21, and MMA § 301(b)(1) does not obviously supersede this definition. We note, moreover, that the very use of the word "plan" does suggest some prior formulation of a way to pay for future liability claims.