**Jeannette D. BROWN, Plaintiff,**

v.

**Tommy G. THOMPSON, Secretary, Department of Health and Human Services, Defendant.**

**No. CIV.A. 02–891–A.**

United States District Court, E.D. Virginia, Alexandria Division.

March 20, 2003.

Peter A. Cerick, Herndon, VA, for Plaintiffs.

Steven E. Gordon, United States Attorney's Office, Alexandria, Va, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This Medicare dispute arose when plaintiff, a Medicare beneficiary, received a medical malpractice settlement from a self-insured health care provider, thereby prompting defendant, Secretary of the Department of Health and Human Services ("Secretary"), to claim a right under the Medicare Secondary Payer Statute ("MSPS")[1] to a portion of the settlement fund as reimbursement for Medicare payments to plaintiff for medical services she received as a result of the malpractice. When the parties were unable to resolve their dispute, this declaratory judgment action ensued.

Presented on summary judgment are the following dispositive questions:

(1) Whether the MSPS reimbursement provision applies to reach a medical malpractice settlement made long after the associated Medicare payments were made.

Or, more specifically,

Whether the MSPS entitles the Secretary to claim a portion of the Kaiser medical malpractice settlement payment as reimbursement for the earlier Medicare payments occasioned by the malpractice, given that at the time the Medicare payments were made, the settlement was not reasonably expected to be paid promptly.

(2) Whether the Kaiser self-insured plan, which funded the malpractice settlement, qualifies as a "primary plan" under the MSPS.

## I.

Plaintiff received medical treatment on August 6, 2000, and again on August 8, 2000 from a Kaiser Urgent Care facility, owned and operated by Kaiser Foundation Health Plan for the Mid–Atlantic States ("Kaiser"). She was not admitted to the hospital on either of those dates, but ultimately required emergency hospitalization at Fairfax Hospital on August 9, 2000 for a perforated sigmoid colon and significant sepsis. Medicare made payments totaling $59,047.13 for medical services rendered during this hospitalization. The Kaiser physicians' failure to admit plaintiff to the hospital on August 6, 2000 was the basis of her February 2001 state medical malpractice claim against Kaiser. This claim was ultimately settled a few days before the scheduled January 14, 2002 trial date; Kaiser paid plaintiff $285,000. Of this amount, plaintiff has voluntarily placed $39,000 in escrow to satisfy the Secretary's claim for reimbursement in the event plaintiff does not prevail in this action.

In June 2001, prior to the January 2002 settlement, plaintiff's attorney informed Medicare of plaintiff's potential recovery from Kaiser. Thereafter, on October 10, 2001, a Medicare representative informed plaintiff's counsel of the government's claim of a right under the MSPS to receive reimbursement for any Medicare payments made to plaintiff for medical ser-

---

1. 42 U.S.C. § 1395y(b)

vices provided as a consequence of the alleged malpractice. Plaintiff disputed this claim, arguing that the MSPS creates no such right in the instant circumstances. The parties unsuccessfully attempted to resolve this dispute short of litigation.

Thus, on June 21, 2002, plaintiff filed a two-count complaint. Count I seeks a declaratory judgment that Medicare has no claim to plaintiff's medical malpractice settlement proceeds; Count II seeks an alternative declaration that should plaintiff not prevail on Count I, the reimbursement must be limited solely to amounts paid for services relating to the alleged malpractice. More specifically, plaintiff contends in Count II that in the event she does not prevail on Count I, the required reimbursement should not include payments for services that pre-dated or were not occasioned by the alleged malpractice, including her cataract surgery, ten days of earlier hospitalization and neurodialysis treatments. Plaintiff also claimed that no interest be allowed given the existence of a "*bona fide* dispute," as provided for in 45 C.F.R. § 30.14.

Following a denial of the Secretary's threshold dismissal motion,[2] the parties, by counsel, sensibly stipulated certain matters thereby facilitating the prompt summary resolution of the dispositive legal issues that are at the core of the parties' dispute, namely whether the MSPS confers on the Secretary the right to reimbursement of the plaintiff's medical malpractice settlement for Medicare payments plaintiff received for medical services related to the malpractice. Specifically, the parties entered into a stipulation (i) dismissing Count II, and (ii) agreeing that in the event plaintiff does not prevail on Count I, she will be obligated to reimburse the Secretary $32,500, which will be Secretary's sole remedy against plaintiff in this case. The parties further stipulated that if plaintiff ultimately prevails in this lawsuit, then plaintiff's attorney may disburse to plaintiff the funds currently held in escrow. Thus, this dispute presents a question, undecided in this circuit, concerning the interpretation and the application of the MSPS to a liability insurance settlement made long after the associated Medicare payments were made.

## II.

Since this is an issue of interpretation of the MSPS, it is appropriate to begin by noting some pertinent background information relating to Medicare and the MSPS. When Medicare was first enacted in 1965, it was essentially the primary payer for medical services supplied to a beneficiary, even when such services were also covered by private insurance. *See Zinman v. Shalala*, 67 F.3d 841, 843 (9th

2. Among the dismissal grounds asserted by the Secretary was the contention that plaintiff had failed to exhaust her administrative remedies. That argument failed as it appears that it would be futile for plaintiff to pursue her claim via the administrative process. *See Brown v. Thompson*, 252 F.Supp.2d 312 (E.D.Va.2003) (Order) (citing *Thetford Properties IV Limited Partnership v. U.S. Department of Housing and Urban Development*, 907 F.2d 445, 450 (4th Cir.1990) (holding that futility requires a "clear showing that an administrative agency has taken a hard and fast position that makes an adverse ruling a certainty");

*Randolph–Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 105–06 (D.C.Cir. 1986) (holding that the futility exception applies when the agency "has articulated a very clear position on the issue which it has demonstrated it would be unwilling to reconsider")). Thus, it was unnecessary to reach the question whether the exhaustion requirement, enunciated in *Buckner v. Heckler*, applies to plaintiff's declaratory action. *See Buckner v. Heckler*, 804 F.2d 258, 259–60 (4th Cir.1986) (holding that Medicare beneficiaries who make claims for benefits "arising under" the Medicare Act must exhaust their administrative remedies).

Cir.1995). Not surprisingly, Congress, in 1980, responded to the resulting "skyrocketing Medicare costs" by enacting the MSPS, which requires Medicare to serve as the secondary payer when a beneficiary has other insurance that can pay or pays for her medical expenses. *See id.* The MSPS thus requires Medicare beneficiaries to exhaust all available private insurance before resorting to their Medicare coverage. *See* 42 U.S.C. § 1395y(b)(2); *see also Zinman,* 67 F.3d at 843; *In re Silicone Gel Breast Implants Products Liability Litigation,* 174 F.Supp.2d 1242, 1250 (N.D.Ala.2001).

▮▮▮▮ Because the question presented is one of statutory construction, analysis appropriately begins with the statutory language and ends there if the statutory language is unambiguous. *See Howe v. Smith,* 452 U.S. 473, 483, 101 S.Ct. 2468, 69 L.Ed.2d 171 (1981) (holding that "in every case involving...[statutory] interpretation..., analysis must begin with the language employed by Congress") (citing *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)). In the event ambiguity infects the statutory language, that ambiguity is best resolved first by reference to the statute's structure and other, related provisions, and then to the statute's purpose expressed at an appropriate level of abstraction. *See Gadsby by Gadsby v. Grasmick,* 109 F.3d 940, 952 (4th Cir.1997) (holding that "any exercise of statutory construction [begins] with the text of the provision in question, and move[s] on, as need be, to the structure

and purpose of the Act," quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)). Resort to legislative history may be appropriate in some circumstances, although this exercise must be undertaken with caution in those instances where lawmakers deliberately insert an ambiguity to mask a political disagreement and then paper the legislative history record with advocacy statements. *See generally Crosby v. National Foreign Trade Council,* 530 U.S. 363, 388–391, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (Scalia J., concurring).[3]

▮▮▮▮ With these principles in mind, the proper focus is the MSPS language, which states, in the pertinent part, as follows:

(A) In general

Payment under [the Medicare program] may not be made, except as provided in subparagraph B, with respect to any item or service to the extent that—

   (i) payment has been made, or can be reasonably be expected to be made, with respect to the item or service, as required under [a group health plan or large group heath plan], or

   (ii) payment has been made or can reasonably be expected to be made promptly...under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance.

---

**3.** In *Crosby v. National Foreign Trade Council,* Justice Scalia noted that

[N]either the statements of individual Members of Congress (ordinarily addressed to a virtually empty floor), nor Executive statements and letters addressed to congressional committees, nor the nonenactment of

other proposed legislation, is a reliable indication of what a majority of both Houses of Congress intended when they voted for the statute....

*Crosby,* 530 U.S. at 390, 120 S.Ct. 2288 (Scalia, J., concurring).

In this subsection, the term "primary plan" means a group health plan or large group health plan, to the extent that clause (i) applies, and a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including self-insured plan) or no fault insurance, to the extent that clause (ii) applies.

(B) Repayment required

    (i) Primary plans

Any payment under [the Medicare program] with respect to any item or service to which subparagraph A applies shall be conditioned on reimbursement to the appropriate Trust Fund...when notice or other information is received that payment for such item or service has been or could have been made under... subparagraph [A].

42 U.S.C. § 1395y(b)(2)(A) (hereinafter "subparagraph A"), 42 U.S.C. § 1395y(b)(2)(B)(i) (hereinafter "subparagraph B").[4]

Subparagraphs A and B are complementary provisions that, when read closely and charitably together,[5] reflect a sensible, integral statutory scheme designed to ensure prompt payments to Medicare beneficiaries, while at the same time ensuring (i) that payments are not made to beneficiaries who have other, primary insurance coverage, or (ii) that Medicare is reimbursed where benefits are paid before the existence of applicable primary insurance coverage is disclosed. Thus, it is apparent from the plain meaning of subparagraph A that this section serves the function of directing the Secretary to withhold Medicare payments in two specific circumstances: (i) where "payment has been made or can reasonably be expected to be made" by a group health plan; and (ii) where "payment has been made or can reasonably be expected to be made promptly"[6] by, inter alia, a self-insured liability plan. See 42 U.S.C. § 1395y(b)(2)(A)(i)-(ii). In both of these circumstances, there is a "primary plan" responsible for payment, and Medicare is only a secondary payer. See id. A "primary plan" is statutorily defined as either: (i) a group plan, or (ii) a worker's compensation plan, automobile or liability insurance plan (including self-insured plans), or no-fault insurance plan if payment has been made, or there is a reasonable expectation that the plan payment will be made promptly. See id.[7] Thus, in plain terms, if an insurer has not made payment, or there is no reasonable expectation of prompt payment, then the MSPS authorizes Medicare to make payment. But importantly, subparagraph A mandates that the Secretary may not make a Medi-

---

**4.** To recover conditional payments made under subparagraph (B), 42 U.S.C. § 1395y(b)(2)(B)(ii) provides that the United States may bring a direct action against any entity that was responsible for making payments, or any other entity or person that has received payment from the primary insurer. See 42 U.S.C. § 1395y(b)(2)(B)(ii).

**5.** There is no doubt that the MSPS is not a model of clarity and coherence. For example, subparagraph A states that payment of Medicare benefits may not be made in the circumstances there described "except as provided in subparagraph B." Yet, subparagraph B does not authorize any Medicare payments;

it deals only with reimbursement for certain payments.

**6.** Health Care Financing Administration ("HCFA") (now Centers for Medicare and Medicaid Services) regulations state that a payment is made "promptly" if made within 120 days after the earlier of the date the care was provided or the date a claim is filed with the insurer. See 42 C.F.R. §§ 411.21, 411.50.

**7.** Kaiser's status as a self-insured plan, and hence a primary plan, is addressed in infra, Part B.

care payment when another insurer, *i.e.* a primary plan, has already made payment, or prompt payment can reasonably be expected from the insurer.

Subparagraph B then addresses the issue of reimbursement from the entities or persons, including beneficiaries, who have received payment from a primary plan for medical services previously paid for with Medicare funds. Specifically, this subparagraph, appropriately entitled "Repayment required; primary plans," simply states that where a primary plan exists, any Medicare payment that has been made is conditioned on reimbursement by the entity that received the primary plan payment. And the Secretary may sue for this reimbursement. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii).

The dispute in this case arises because subparagraph B states that Medicare payments subject to reimbursement are those "with respect to any item or service to which subparagraph A applies." *See* 42 U.S.C. § 1395y(b)(2)(B)(i). Focusing solely on this language, plaintiff claims that because her medical malpractice settlement was not "made promptly," as stated in subparagraph A, reimbursement is not appropriate. This construction misreads the statute and is at odds with the statute's obvious and sensible purpose of ensuring that Medicare is a secondary payer only after Medicare beneficiaries have exhausted their private insurance. *See Zinman*, 67 F.3d at 843; *Silicone Gel Breast Implants*, 174 F.Supp.2d at 1250. The reference in subparagraph B to "item or service to which subparagraph A applies" does not and cannot refer to Medicare

payments as to which A "applies," because, by its terms, subparagraph A prohibits Medicare payments in these circumstances. Instead, the reference in subparagraph B to "item or service to which subparagraph A applies" must refer only to that portion of subparagraph A that defines a primary plan. In other words, the reference to subparagraph A in subparagraph B serves simply to define the universe of reimbursable payments to consist of those where primary coverage exists. Any other construction of this phrase in subparagraph B results in effectively and nonsensically shrinking the universe of reimbursable payments to a nearly null set, a result clearly contrary to the statute's purpose.[8] Thus, it makes no sense to construe the disputed phrase in subparagraph B, as plaintiff does here, to limit reimbursement to instances where Medicare payments are made under subparagraph A, as no payments are allowed in the circumstances of subparagraph A, and hence there can be no Medicare payments to which subparagraph A "applies." In effect, plaintiff's construction of subparagraph B eliminates reimbursement in circumstances where there is disputed liability insurance, as insurance payments in these circumstances typically are neither promptly made, nor reasonably expected to be made promptly. To the contrary, years may pass before coverage, liability, and damages are settled or fully litigated. Elimination of this set of insurance payments from the scope of subparagraph B reimbursement is plainly at odds with the purpose of the MSPS. Properly construed, therefore, subparagraph B requires reim-

---

**8.** Acceptance of plaintiff's construction of the MSPS would mean that reimbursement would be appropriate only in those presumably few circumstances where a Medicare payment was mistakenly made in contravention of subparagraph A. Under plaintiff's construction of the statute, there would never be an occasion for reimbursement in the event there was full compliance with subparagraph A because no Medicare payments would be made in those circumstances, which are, as plaintiff sees it, the only circumstances where reimbursement applies under subparagraph B.

bursement for a payment, as here, that "has been made" from a "primary plan" as defined in subparagraph A. *See* 42 U.S.C. § 1395y(b)(2)(B)(i).

In the simplest terms, subparagraph A tells the Secretary not to make Medicare payments where a primary plan or payer exists, while subparagraph B authorizes the Secretary to obtain reimbursement for Medicare payments that have been made for certain medical services where the existence of a primary plan to cover those services becomes known after, indeed even well after, the Medicare payment is made. The sole purpose of the phrase "reasonably expected to be made promptly" in subparagraph A is to ensure that needed Medicare payments are not delayed to the detriment of a Medicare beneficiary in circumstances precisely similar to those at bar.

Further support for this construction of the MSPS is found elsewhere in subparagraph B, where the statute directs that Medicare payments "shall be conditioned on reimbursement...when notice or information is received that payment for such item or service *has been* or could be made under [subparagraph A]." *See* 42 U.S.C. § 1395y(b)(2)(B)(i) (emphasis added). This language clearly reflects that the MSPS contemplates a situation where Medicare is entitled to reimbursement where, as here, Medicare *has made* a payment, but *later*, indeed here considerably later, receives information that a primary payer exists and has made, or should make, payment.

The parties have cited no controlling Supreme Court or Fourth Circuit authority on this important issue of MSPS interpretation, nor does research disclose any

such authority. Yet there is authority from elsewhere, and it is important, and somewhat daunting, to note that the result reached here is contrary to the result reached by the only two courts that have carefully reviewed this issue.[9] In *Thompson v. Goetzmann* and *In re Orthopedic Bone Screw Products Liability Litigation*, the position plaintiff advocates here prevailed; in both cases, the courts held that a settlement payment was not reimbursable because there was no primary plan, *i.e.* there was no reasonable expectation that another insurer would make payment promptly, which is defined in the applicable regulation as within 120 days of the provision of the service or of filing of the claim with the insurer, whichever is earlier. *See Thompson v. Goetzmann*, 315 F.3d 457, 2002 WL 31819899, *9 (5th Cir. 2002); *In re Orthopedic Bone Screw Products Liability Litigation*, 202 F.R.D. 154, 167–168, 170 (E.D.Pa.2001) (hereinafter *Orthopedic Bone Screw*) (on appeal); *supra* n. 5 (discussing the statutory definition of "promptly"). These cases mistakenly focus too narrowly on the "prompt payment" requirement, thereby failing adequately to consider both the practical effect of their interpretation of the MSPS and the fact that their interpretation is flatly contrary to the statute's purpose of making Medicare a secondary payer when there is a primary plan responsible for payment. Instead, if subparagraph A and B are viewed as sensible and complementary provisions, then the so-called prompt payment requirement in subparagraph A should not be read into subparagraph B as a requirement for reimbursement; rather, subparagraph A's prompt payment requirement should be limited to its ap-

---

**9.** Two other courts, in dicta, noted that were it necessary to reach the issue, they would construe the MSPS as plaintiff advocates. *See In re Diet Drugs v. American Home Products*

*Corp.*, 2001 WL 283163, *11 n. 20 (E.D.Pa. 2001); *In re Dow Corning Corp.*, 250 B.R. 298, 348 n. 29 (Bankr.E.D.Mich.2000).

propriate role of ensuring that Medicare payments are not delayed where prompt payment by a primary plan cannot reasonably be expected. And, the reference to subparagraph A found in subparagraph B is properly read, consistent with the MSPS's structure and purpose, to provide that reimbursement is appropriate where there is a "primary plan," as defined in subparagraph A.

Given this reading of subparagraph A and subparagraph B, the Secretary is entitled to reimbursement if the Kaiser plan, which funded the settlement, is a self-insured primary plan as defined in subparagraph A. Resolution of this issue is the next step in the analysis.

### B.

■ According to HCFA's regulations pertaining to the MSPS, a "plan" is "an arrangement, oral or written...to provide health benefits or medical care or assume legal liability for injury or illness." 42 C.F.R. § 411.21. A "self-insured plan" is a "plan under which an individual, or private or governmental entity, carries its own risk instead of taking out insurance with a carrier." 42 C.F.R. § 411.50. The Fifth Circuit in *Goetzmann* has appropriately concluded that under the MSPS, "a 'primary plan' of 'self-insurance' requires an entity's *ex ante* adoption, for itself, of an arrangement for (1) a source of funds and (2) procedures for disbursing these funds when claims are made against the entity." *Goetzmann,* 315 F.3d 457, 462 (citing *Orthopedic Bone Screw,* 202 F.R.D. at 166; *In re Diet Drugs,* 2001 WL 283163, at *10). The *Goetzmann* court also relied upon a leading insurance treatise, which notes that while "self-insurance" has no "precise legal meaning,"

> ...to meet the conceptual definition of self-insurance, an entity would have to engage in the same sorts of underwriting procedures that insurance companies employ; estimating likely losses during the period, setting up a mechanism for creating sufficient reserves to meet those losses as they occur, and usually, arranging for commercial insurance of losses in excess of some stated amount.

*Goetzmann,* 315 F.3d at 462 (citing 1 Couch on Insurance 10:1 (3d 1997)).[10]

These principles, applied here, point persuasively to the conclusion that plaintiff's medical malpractice payment was made from an "primary plan," as defined in the MSPS. As the record reflects, Kaiser has a formal program that fits squarely within the generally accepted definition of self-insurance: (i) Kaiser maintains a separate reserve on its financial statements for all its professional liability claims; (ii) the amount of this reserve was determined by an independent actuarial review and reviewed by Kaiser's auditors; and (iii) Kaiser utilizes commercial insurance in order to meet losses in excess of the reserve amount.

It is worth noting that given these facts, Kaiser's program of self-insurance is plainly distinguishable in significant respects from, in the Fifth Circuit's words, the "seven judicial rejections" of Medicare's attempts to construe the MSPS to allow reimbursement from ordinary, uninsured tortfeasors who settled with their injured

---

10. Plaintiff argues, unpersuasively, that HCFA regulations regarding reimbursement of providers of health services for certain self-insurance expenses should be imported into the MSPS's definition of self-insurance. Yet these regulations, because they apply in a different context for reasons specific to that context, have nothing to do with the MSPS, for which there already exists regulations defining a self-insured plan. *See* 42 C.F.R. §§ 411.21, 411.50. Given this, it is neither necessary nor appropriate to resort to these unrelated HCFA regulations in applying the MSPS.

plaintiffs. *See Goetzmann,* 315 F.3d at 469–70 n. 65 (citations omitted). Tortfeasors who make settlement payments do not constitute "self-insured plans" under the MSPS simply because they lack separate liability insurance. *Goetzmann,* 315 F.3d at 463–64. Indeed, to hold otherwise would render "every tortfeasor that used its general assets to fund a tort settlement with persons who had received federal health care benefits...potentially liable under the MSPS." *See Orthopedic Bone Screw,* 202 F.R.D. at 165 (citing *In re Diet Drugs,* 2001 WL 283163, at \*10). In sum, Kaiser's plan is a self-insurance liability plan that meets the definition of "primary plan" under the MSPS.

An appropriate Order will issue.