**ESTATE OF Teresa URSO, Plaintiff,**

v.

**Tommy G. THOMPSON, Secretary of the U.S. Department of Health and Human Services, Defendant.**

No. CIV.3:02 CV 1660(MRK).

United States District Court,
D. Connecticut.

March 10, 2004.

**254**

Peter J. Zagorsky, Zagorsky, Zagorsky
& Galske, Plainville, CT, for Plaintiff.

Douglas P. Morabito, U.S. Attorney's
Office, New Haven, CT, for Defendant.

## MEMORANDUM OF DECISION

KRAVITZ, District Judge.

In this action, plaintiff seeks review of a final decision of the Secretary of the U.S. Department of Health and Human Services (the "Secretary") following a hearing before an Administrative Law Judge ("ALJ"). *See* 42 U.S.C. § 405(g). The ALJ determined that there had been an overpayment of Medicare benefits to the late Teresa Urso under Medicare's secondary payer provisions, 42 U.S.C. § 1395y(b), and that the amount of the alleged overpayment should not be adjusted or waived. The alleged overpayment arose because several years after Medicare had paid for medical services rendered to Ms. Urso for a fractured hip, she received a settlement from a lawsuit that she had filed against the alleged tortfeasor responsible for her slip and fall accident.

Presently before the Court is plaintiff's Motion for Reversal or Remand [doc. # 13]. The Secretary opposes plaintiff's motion and seeks an order affirming the Secretary's decision [doc. # 16]. For the reasons set forth below, the Court GRANTS in part Plaintiff's Motion for Reversal or Remand and DENIES the Secretary's Motion for Affirmance.

### I.

The underlying facts are not in dispute. In April 1992, Ms. Urso was hospitalized at New Britain General Hospital for a fractured hip, which she sustained in a slip and fall accident at a local supermarket. Administrative Record ("A.R.") at 29, 49. At the time, Ms. Urso was 79 years old and had income of modest means. A.R. 56; Plaintiff's Exhibit 45 [1] ["Ex. 45"], Exhibit

---

**1.** Exhibit 45 was added to the record upon the granting of plaintiff's Motion to Add to the

C. Following surgery, hospital care and a brief stay at an extended care facility, Ms. Urso was discharged to her home in or about June 1992. Ex. 45, Exhibits F, G. Medicare paid for the medical services related to the accident. A.R. at 99. Mr. Urso later suffered one or more heart attacks unrelated to the accident and received treatment at several hospitals and convalescent homes for her heart ailments. A.R. at 196, 331. Medicare also paid for the charges related to Ms. Urso's heart condition. A.R. 50–53.

In 1992, Ms. Urso filed a tort lawsuit against the supermarket where she had fallen. Liability was contested, but approximately two years later, on December 28, 1994, Ms. Urso settled that lawsuit with the supermarket's liability insurer for $35,000. A.R. 53, 83. Medicare was notified of the settlement, and on January 12, 1995, Medicare's intermediary, Aetna Life Insurance Company ("Aetna"), notified Ms. Urso that she was required to reimburse Medicare $10,468.70 from the settlement, and that failure to reimburse Medicare may render Ms. Urso personally liable for the amount due. A.R. 79–81. Aetna arrived at the amount of the claimed reimbursement as follows: Aetna started with the amount it believed Medicare had paid for medical services arising from Ms. Urso's accident—an amount asserted to be $16,105.70[2]; from that amount, Aetna then deducted the sum of $5,637 for Medicare's pro rata share of the attorney's fees and other procurement costs incurred in the personal injury action. A.R. at 81. Had Ms. Urso reim-

bursed Medicare for the amount claimed—$10,468.70—she would have been left with a total of $12,313.78 from the $35,000 settlement after paying attorney's fees and costs of $12,217.52. A.R. at 75, 81. Instead, Ms. Urso contested Medicare's reimbursement claim and her attorney held the entirety of the settlement proceeds in escrow pending resolution of Medicare's claim. A.R. at 32.

On February 9, 1995, Ms. Urso requested a waiver of Medicare's claimed overpayment under 42 U.S.C. § 1395y(b)(2), which permits the Secretary to waive the secondary payer provisions of Medicare in whole or part if the Secretary "determines that the waiver is in the best interests of the program." A.R. at 68. At the time of the request, Ms. Urso was confined to a nursing home, had monthly income of $736 from Social Security and pension benefits and total assets of only $130. A.R. at 56. The bill for her nursing home care was $5,214 per month. A.R. at 55. Unfortunately, while Ms. Urso's request for a waiver was pending, she died—on October 22, 1995—from conditions unrelated to the injuries she had sustained in the slip and fall accident. A.R. at 49, 54, 59, 61.

Following Ms. Urso's death, an ALJ held a hearing on November 14, 1997 regarding the waiver request, which was now pursued by her estate. In denying the request, the ALJ concluded that the Secretary was a "secondary payer" under 42 U.S.C. § 1395y(b)(2) and therefore had a right to recover medical payments from the settlement, that there was no basis for adjusting the amount of the claimed over-

---

Record [doc. # 12]. Exhibit 45 is listed on the "List of Exhibits" attached to the ALJ's ruling, and was submitted to the ALJ subsequent to the hearing. A.R. at 35.

**2.** Aetna identified the following accident-related payments: $9,417.71 to New Britain General Hospital for the April 9, 1992 hospi-

talization, A.R. 103–105, 110–11; payments of $2,975.40 and $477.40 to Plainville Health Care Venter for the extended care services provided to Ms. Urso in May and June of 1992, A.R. 102; and $3,235.19 in miscellaneous payments for physician, ambulance, x-ray, and other "Part B" services, A.R. 90–91.

payment of $10,468.70, and that the criteria for waiver had not been met. A.R. 29–31. This appeal followed.[3]

## II.

In reviewing the ALJ's decision, this Court is limited to two inquiries. First, the Court must determine whether the ALJ applied the correct legal principles in rendering a decision. Second, the Court must determiner whether the ALJ's decision is supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987). "Substantial evidence" is "more than a mere scintilla, and is such relevant evidence as reasonable mind might accept as adequate to support a conclusion." *Jasinski v. Barnhart*, 341 F.3d 182, 184 (quotation marks omitted). In determining whether substantial evidence supports the decision, the reviewing Court will carefully consider the entire record and examine "evidence from both sides because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). The Court is not obligated to accept the ALJ's decision where the ALJ "failed to apply proper legal principles or failed explicitly to consider evidence critical to a just determination" of the claimant's case. *Williams v. Bowen*, 1989 WL 1307, at *3 (S.D.N.Y., Jan.5, 1989) (citing *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980)). With these standards in mind, the Court will address each claimed error in the ALJ's decision.

## A.

As a threshold matter, plaintiff challenges the ALJ's determination that the Secretary was entitled to reimbursement under Medicare's secondary payer ("MSP") provisions. The MSP provisions at issue are found at 42 U.S.C. § 1395y(b)(2)(A) and (B). They provide, in relevant part, as follows:

### (A) In general

Payment under [the Medicare program] may not be made, except as provided in subparagraph B, with respect to any item of service to the extent that -

(i) . . ., or

(ii) payment has been made or can reasonably be expected to be made promptly (as determined in accordance with regulations) under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance.

In this subsection, the term "primary plan" means a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including self-insured plan) or no faulty insurance, to the extent that clause (ii) applies.

### (B) Repayment Required

### (i) Primary Plans

Any payment under this subchapter with respect to any item or service to

---

3. Sadly, this case experienced interminable delays at the administrative level. The ALJ held a hearing on plaintiff's request in November 1997 and denied the request on July 25, 1998. A.R. at 28–32. On October 29, 1999, the Medicare Appeals Council ("MAC") remanded the case for a new hearing because the hearing file could not be located. A.R. at 14. However, on April 29, 2002, the MAC vacated its remand order because the file had been located, and on July 22, 2002, the MAC decided that there was no basis for reviewing the ALJ's decision. A.R. at 5–7. The ALJ's decision, therefore, represents the final decision of the Secretary and references in this opinion to either the ALJ's decision or the Secretary's decision refer to the decision issued by the ALJ on June 25, 1998. A.R. 28–32.

which subparagraph (A) applies shall be conditioned on reimbursement to the appropriate Trust Fund ... when notice or other information is received that payment for such item or service has been or could be made under such subparagraph.

### (ii) Subrogation Rights

The United States shall be subrogated (to the extent of payment made under this subchapter for such an item of service) to any right under this subchapter of an individual or any other entity to payment with respect to such item or service under a primary plan.

42 U.S.C. §§ 1395y(b)(A)(B)(i), (B)(ii).

The Secretary has adopted regulations implementing the MSP provisions. *See* 42 C.F.R. § 411.20 *et seq.* As is relevant here, the regulations establish rules for determining whether a payment under a primary plan will be deemed to be made "promptly" under subparagraph (A)(ii).[4] The regulations also state that if a primary plan has not paid for an item or service and is not expected to pay within the time frames set forth in the regulations, Medicare will make a "conditional payment" of the item or service and then recoup the conditional payment if it is later determined that a primary plan has paid for that item or service. *See id.* §§ 411.21 (defining "conditional payment"), 411.24 (recovery of conditional payments), 411.52 (conditional payments in liability cases).

The dispute between the parties involves a question of statutory construction. That question turns on the proper interpretation of two phrases that appear in the MSP statute: (1) the phrase "reasonably be expected to be made *promptly*" in subparagraph (A)(ii); and (2) the phrase "payment ... with respect to any item or service *to which subparagraph (A) applies*" in subparagraph (B)(i). *See* 42 U.S.C. §§ 1395y(b)(2)(A)(ii); 1395y(b)(2)(B)(i) (emphasis added).

Plaintiff argues that under the plain language of the MSP provisions, Medicare's right to seek reimbursement under subparagraph (B)(i) is entirely dependent upon Medicare having made a payment "to which subparagraph (A) applies" and that Medicare cannot make a payment as a secondary payer under subparagraph (A)(ii) unless a primary plan (in this case a liability insurance policy) has already made a payment for an item or service or Medicare "reasonably" expects that the primary plan will make such a payment "promptly." In other words, plaintiff argues that Medicare is entitled to reimbursement *only* if it pays medical expenses at a time when payment from a primary plan either has already occurred or is expected "promptly."

Since in this case, at the time when Medicare paid Ms. Urso's medical expenses in 1992, payment by the supermarket's insurer (which disputed liability) could not "reasonably [have] be[en] expected to be made promptly"—indeed, it was not made until 1994—Medicare could not have paid Mr. Urso's bills as a "secondary payer" under subparagraph (A)(ii). It follows, therefore, that Medicare cannot now seek reimbursement of those payments under subparagraph (B)(i), since those payments were not "payments ... to which subparagraph (A) applies," the operative language of subparagraph (B)(i). In ef-

---

4. In all cases other than liability insurance, "promptly" means 120 days after receipt of the claim. 42 C.F.R. § 411.21. Where a liability insurer is the primary plan, "promptly" means within 120 days after the earlier of (1) the date a claim is filed with the insurer or a lien is filed against a potential liability settlement, or (2) the date the service was furnished, or, in the case of inpatient hospital care, the date of discharge. *Id.* § 411.50.

fect, plaintiff argues that when Medicare paid Ms. Urso's medical expenses, it did so not as a secondary payer (indeed, plaintiff argues Medicare was barred by subparagraph (A)(ii) from making payments as a secondary payer) but rather as the primary payer, and as a primary payer, Medicare has no right to seek reimbursement out of Ms. Urso's settlement with the supermarket's insurer.

The Secretary counters that while plaintiff has posited one possible construction of these provisions, that is not the only plausible interpretation of subparagraphs (A) and (B). Another reasonable way to interpret the statutory language, says the Secretary, is to read the phrase "reasonably expected to be made promptly" in subparagraph (A)(ii) as ensuring only that Medicare payments are not delayed when, as here, payment from a primary plan is not expected "promptly" and not, as plaintiff argues, as restricting Medicare's ability to seek reimbursement under subparagraph (B)(i) for items or services paid by Medicare when it becomes clear at some later point in time that another payer (such as the liability insurer in this case) is primarily responsible for those items or services. This construction is possible under the language of the MSP provisions, the Secretary argues, if one reads the phrase "item or service to which subparagraph A applies" in subparagraph B(i) as referring *only* to that portion of subparagraph (A) that defines a "primary plan." In other words, as one court recently explained, "the reference in subparagraph B serves

simply to define the universe of reimbursable payments to consist of those where primary coverage exists." *Brown v. Thompson*, 252 F.Supp.2d 312, 318–19 (E.D.Va.2003). Where a primary plan exists, any Medicare payment is conditioned on reimbursement from the primary plan's payment, and the Secretary is authorized to bring suit to recover those amounts. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii). And, the Secretary notes—invoking *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)—since there is more than one plausible way to interpret subparagraphs (A)(ii) and (B)(i) and since Congress expressly delegated rulemaking authority to the Secretary, his reasonable construction of the MSP statute governs.

This is an admittedly close question. Indeed, it is one that has divided several courts. *Compare Orthopedic Bone Screw Prods. Liability Litig.*, 202 F.R.D. 154, 167–69 (E.D.Pa.2001) (when Medicare pays for health care at a time when it cannot reasonably expect the item or service to be paid for "promptly" by a liability insurer, the Medicare payment is not conditional and the Government does not acquire secondary payer status) *with Brown*, 252 F.Supp.2d at 319 (cases such as *Orthopedic Bone Screw* "mistakenly focus too narrowly on the 'prompt payment' requirement").[5] One could well conclude that the Secretary's argument, which focuses on the definition of "primary plan" in the final paragraph of subparagraph (A)(ii), ignores

---

**5.** The original decision of the Fifth Circuit in *Thompson v. Goetzmann*, 315 F.3d 457, 468 (5th Cir.2002) adopted the approach of the *Orthopedic Bone Screw* decision. However, on petition for rehearing *en banc*, the Fifth Circuit panel amended its opinion to delete the portion of its decision that had adopted the *Orthopedic Bone Screw* approach. *Thompson v. Goetzmann*, 337 F.3d 489, 492–93 (5th Cir.2003). Notwithstanding with-

drawal of that portion of its decision, the panel stated (now, presumably in dicta) that "we remain convinced that the plain language of the MSP statute makes the reasonable expectation of prompt payment a requirement for the government's collection from those 'primary plans' listed in § 1395y(b)(2)(A)(ii)," an interpretation that even the panel acknowledged would lead to "arguably absurd results." *Id.* at 493.

that definition's explicit reference to "clause (ii)," which in turns contains the "prompt payment" language invoked by plaintiff.

Nevertheless, having carefully considered the positions of both sides, the Court is persuaded that in a statute that is as convoluted and complex and such a model of *un*-clarity as the Medicare statute, plaintiff has read far more into the word "promptly" in subparagraph (A)(ii) than the word should properly bear. *See Beverly Cmty. Hosp. Ass'n v. Belshe,* 132 F.3d 1259, 1266 (9th Cir.1997) (noting that "clarity is recognized as totally absent from the Medicare and Medicaid statutes"). As a result, this Court believes that there is sufficient play in both the language and structure of subparagraph (A)(ii) and (B)(i)—and their grammatical and textual relationship to one another—to support the Secretary's position that these provisions are not entirely clear and that his construction of the MSP statute is a reasonable one, and, thus, entitled to deference.

Recently, two courts have exhaustively considered the language, structure, intent and legislative history of the MSP statute as well as relevant case law, and they reached the same conclusion that this Court now reaches. *See United States v. Baxter,* 345 F.3d 866, 887–93 (11th Cir. 2003); *Brown,* 252 F.Supp.2d at 316–20. Nothing would be served by repeating here the thorough discussion and analysis provided by those two courts. Suffice it to say for present purposes that this Court agrees with the conclusion reached in both *Baxter* and *Brown* for the reasons stated in those opinions. As then-Judge, now-Justice Breyer put it: "Taken literally, this language [from subparagraphs (A) and (B) ] simply says (in respect to a Medicare subscriber with a private source of insurance), 'if we can be reasonably certain that the insurance company will pay, Medicare won't pay; if we cannot be certain, Medicare will pay, but then, if the company pays you, you must reimburse Medicare.' " *Rybicki v. Hartley,* 792 F.2d 260, 262 (1st Cir.1986).

For the foregoing reasons, therefore, the Court concludes that the Secretary's long-standing construction of the MSP statute is consistent with both the wording and structure of that law. The Secretary's interpretation also best accords with the "history and purpose of the MSP statute, all of which plainly indicate that Congress wanted Medicare's payments to be secondary and subject to recoupment in all situations where one of the statutorily enumerated sources of primary coverage could pay instead." *Baxter,* 345 F.3d at 888. As a consequence, the ALJ did not err in concluding that the Secretary was entitled as a secondary payer to reimbursement from the proceeds of Ms. Urso's settlement with the supermarket's liability insurer.

### B.

Plaintiff also objected to the amount of the claim for reimbursement on the ground that the $10,468.70 claimed by Medicare included payments for items and services that were unrelated to Ms. Urso's slip and fall accident. In his brief, the Secretary conceded that Medicare's claim included payments for items and services rendered in periods both before Ms. Urso fractured her hip and also long after she was discharged to her home in June 1992. The Secretary acknowledged in his brief that at least $263.84 of those payments should not have been included in Medicare's claim, and at oral argument, counsel for the Secretary conceded further that any amounts related to Ms. Urso's heart attacks and subsequent care and convales-

cence should also be deleted from Medicare's claimed reimbursement.

■ According to the Secretary, however, it was plaintiff's responsibility to sift through the medical bills and payments and prove which Medicare payments were unrelated to the accident and plaintiff failed to do so. Nonetheless, counsel for the Secretary conceded at argument that he knew of no decision placing the burden for such a showing on plaintiff.

The Court disagrees with the Secretary's position on which party has the burden of proof on this issue. Absent some statutory provision to the contrary, it is only fair and just that Medicare bear the ultimate burden of justifying the amounts it seeks in reimbursement. It is undoubtedly true, as the Secretary suggests, that recipients of Medicare benefits such as Ms. Urso are perhaps in a better position as an initial matter to evaluate the reimbursement claim and to assess whether a payment made by Medicare was truly for an item or service that was ultimately paid by a primary plan. But even if a Medicare recipient had the initial burden of making a *prima facie* case that Medicare's reimbursement request were overinclusive, it is the Secretary who should bear the ultimate burden of persuasion on this issue, since it is the Secretary who is seeking reimbursement. A Medicare subscriber such as Ms. Urso should not bear the burden of proving a negative.

It is abundantly clear that the Secretary did not discharge his burden in this case. Plaintiff tendered all of the bills and medical reports that were relevant to Medicare's claim, which were voluminous, and gave a good faith estimate from this documentation that approximately one fourth of Medicare's claimed reimbursement related to items or services that had nothing to do with the accident—for example, payments for cardiological services and services for

diabetes, paraesophegeal hernia and hypertension. A.R. at 36; *see* Ex. 45, Exhibits B–F. At that point, the Secretary was required to go through the documentation and justify each payment that the Secretary believed was related to the slip and fall accident. It is undisputed that the Secretary never made such a showing and the ALJ never required the Secretary to do so. *See Baerga v. Richardson,* 500 F.2d 309, 312–13 (3rd Cir.1974); *accord Johnson,* 817 F.2d at 986 (admonishing that the hearing examiner's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision"). Instead, the ALJ accepted the Secretary's asserted claim, and refused to adjust the claimed amount because plaintiff failed to prove that the claim covered items or services unrelated to the accident. A.R. at 31.

The ALJ erred as a matter of law in placing the ultimate burden of proof on plaintiff. Since no one went through the voluminous medical information submitted by plaintiff to determine which payments were related to the accident and which were not, this Court cannot conclude that the ALJ's determination of the amount of reimbursement is supported by substantial evidence in the record. *See Padilla v. Heckler,* 643 F.Supp. 481, 488 (S.D.N.Y. 1986) (ALJ's failure to consider undisputed, relevant evidence in denying benefits prevented reviewing court's finding that the ALJ's decision was based on substantial evidence); *cf. Richardson,* 402 U.S. at 401, 91 S.Ct. 1420 (substantial evidence "means such *relevant* evidence as a reasonable mind might accept as adequate to support a conclusion") (emphasis added).

## C.

■ Plaintiff also contests the ALJ's denial of Ms. Urso's request for a waiver under 42 U.S.C. § 1395y(b)(2). There is little doubt that had Ms. Urso's waiver request been decided while she was alive, she would have presented the paradigmatic case for waiver of reimbursement under the MSP provisions. She was not at fault in any way and she had essentially no assets, little income and large monthly nursing home bills. Ms. Urso would easily have satisfied the criteria for waivers adopted by the Secretary. *See* 20 C.F.R. §§ 404.507–404.512; 42 C.F.R. §§ 405.350–405.358. At argument, counsel for the Secretary did not contend otherwise.

The only question is whether because Ms. Urso died before the Secretary adjudicated her waiver request, Ms. Urso's estate should be denied the waiver to which Ms. Urso would have been entitled. Plaintiff submitted evidence regarding the substantial costs related to Ms. Urso's funeral as well as the significant amounts that Ms. Urso's heirs had advanced for her care and out-of-pocket during her lifetime in anticipation that those amounts would be reimbursed out of any tort recovery. *See* Ex. 45, Exhibits I, J. Yet, there is no indication in the ALJ's decision that he considered any of this evidence or evaluated it in light of the statutory and regulatory criteria for waivers. Indeed, although the ALJ cited the relevant regulations, he never discussed the regulatory criteria or plaintiff's arguments in his decision. The Court notes as well that there is no indication that the ALJ considered the fact that had the Secretary made a determination of Ms. Urso's waiver request while she was living, she undoubtedly would have been entitled to a waiver. For these reasons, it is not possible for this Court to determine whether the ALJ properly applied the regulations in evaluating plaintiff's evidence.

Therefore, the Court is unable adequately to consider whether substantial evidence supports the ALJ's decision to deny plaintiff's waiver request. *See Johnson,* 817 F.2d at 986 (the lack of specificity of ALJ's decision and inconclusiveness of the record prompted remand to ensure that the correct legal principles are applied to determination of case).

## III.

In view of this Court's doubts regarding the amount of Medicare's claimed reimbursement and the Court's substantial concerns regarding the Secretary's consideration of plaintiff's waiver claim, the Court is compelled to reverse the Secretary's decision and remand this matter for further proceedings consistent with this decision. The Court would be remiss, however, if it did not note that this matter has been pending (through no apparent fault of plaintiff) for far too long without resolution. Therefore, it is this Court's fervent hope and expectation (expressed to counsel for the Secretary at oral argument) that the parties will promptly resolve this dispute in a fair and equitable manner. Ms. Urso's heirs deserve respect and closure. They are entitled to nothing less.

IT IS SO ORDERED,